In re J. M. FIELDS, INC., Food Fair, Inc., et al., Debtors.

Nos. 78 B 1764–78 B 1773.

United States Bankruptcy Court, S. D. New York.

Sept. 1, 1982.

Levin & Weintraub, New York City, for debtor.

Sunshine & Sunshine, New York City, for Jerome Silverstein d/b/a Silverstein Agency.

## MEMORANDUM & ORDER

JOHN J. GALGAY, Bankruptcy Judge.

The question presently before this Court is whether the real estate brokerage commissions payable to the Silverstein Agency ("Silverstein"), under the terms of its brokerage agreement dated September 21, 1973, ("Brokerage Agreement"), with Food Fair, Inc. ("Food Fair") should be deemed a general unsecured claim or an expense in administration. For reasons to be set forth below, this Court finds that the claim of Silverstein for brokerage commissions is a general unsecured claim, and the Court holds that Silverstein may file a general claim in these proceedings.

A summary of the leases and contractual arrangements underlying the controversy between Food Fair and Silverstein is essential to an understanding of the present decision by this Court.

Food Fair, as tenant, and the Sixth Fairland, Inc., ("Fairland"), as landlord, entered into a lease agreement dated May 25, 1964, ("Overlease") under which Food Fair rented the supermarket building located at Long Hill and Drozdyk Road, Groton, Connecticut known as Store No. 312. Under the express terms Article 2(2) of the Overlease, Food Fair was given the right to make a written offer for the purchase of the land with the supermarket building ("Premises").

Subsequently, Food Fair entered into a sublease agreement dated September 10, 1973, ("Sublease") with New England Variety Distributors, Inc. ("Subtenant") under which the subtenant rented Store No. 312. Paragraph 49 of the Sublease contains a purchase option provision similar to the purchase option in the Overlease. The Sublease provision obligated Food Fair to exercise the purchaser option in the Overlease upon written demand by the Subtenant and to resell the Premises to the Subtenant at the same purchase price.

On September 21, 1973, eleven days after entering into the Sublease, Food Fair submitted the Brokerage Agreement, a letter agreement, to Silverstein. Silverstein signed and returned the Brokerage Agreement on September 25, 1973. Under the express terms of the Brokerage Agreement, Food Fair is obligated to pay Silverstein, quarterly during the primary lease term,

five percent of the minimum rent collected from the Subtenant. Additionally, in the event that the Subtenant successfully exercises the purchase option in the Sublease, Food Fair is obligated to pay Silverstein five percent of the purchase price.

It should be noted that the Brokerage Agreement does not impose any affirmative duties on Silverstein and that Food Fair and Silverstein are the only parties to the agreement, not Fairland or the Subtenant. Moreover, the Brokerage Agreement does not incorporate the express terms of the Sublease either by reference or otherwise. In addition, neither Food Fair nor Silverstein allege that the Sublease incorporates the terms of the Brokerage Agreement. Accordingly, the Brokerage Agreement stands as a distinct, separate agreement from the Sublease.

On October 2, 1978, five years after the signing of the Brokerage Agreement, Food Fair filed a petition for an arrangement under Chapter XI, Section 322 of the Bankruptcy Act and Bankruptcy Rule 11–6, and it continued in the management and operation of its business and properties as debtor in possession. The principals of the Subtenant operating under the name Seven Hundred Long Hill Road Associates ("700 Associates") subsequently gave notice of their intention to exercise the purchase option in the Sublease.

By application dated February 17, 1981, Food Fair brought a motion before this Court for an order approving the sale of the Premises to 700 Associates and the real estate sales contract between Fairland and 700 Associates. Additionally, Food Fair sought an order rejecting and disaffirming its Brokerage Agreement with Silverstein and authorizing Silverstein to file any and all claims arising from the agreement as a general unsecured claim.

Silverstein objected that Food Fair has paid commissions in the amount of $18,-000.00 on rentals that accrued after the filing of the Chapter XI petition[1] and has thus assumed performance of the Brokerage Agreement. Furthermore, Silverstein argues that the Brokerage Agreement and purchase option in the Sublease are "inextricably intertwined" and thus Food Fair "implicitly assumed the entire transaction" or "package" when it continued the Sublease and collected rents from the Subtenant.

Silverstein also objects that Food Fair's equitable position is unfavorable and urges this Court not to allow Food Fair to confirm the Sublease and "reap the benefit of the Subleasee's [sic] exercise of the option to purchase" and at the same time reject the Brokerage Agreement and be discharged of its obligations under such agreement.

It is the position of Food Fair that the Brokerage Agreement is not an executory contract that can be assumed or rejected in bankruptcy, as it had been fully performed on one side prior to the date of the Chapter XI petition. Food Fair argues that Silverstein's right to be paid a percentage of the purchase price for the Premises was *earned* prior to the date of the petition, but Food Fair's obligation to pay was deferred until the purchase option had actually been exercised. In sum, Food Fair contends that any claim Silverstein asserts for brokerage commissions is a general unsecured claim since it arose at the time the two parties entered into the Brokerage Agreement long before the commencement of this Chapter XI proceeding.

By order filed on March 3, 1981, this Court approved the sale of the Premises to 700 Associates and the real estate sales contract between Fairland and 700 Associates "without prejudice to any and all claims of Silverstein Agency arising out of the Brokerage Agreement dated September 12, 1973."

---

1. Silverstein also alleges that Food Fair made a written demand on January 27, 1981, for the return of the post-petition commissions.

## I

In order to resolve the instant controversy concerning the status of Silverstein's claim for brokerage commissions, this Court must initially determine whether the Brokerage Agreement between Silverstein and Food Fair is an "executory contract" within the meaning of the Bankruptcy Act.

If the Court deemed the Brokerage Agreement was an "executory contract," Food Fair would have the choice of assuming or rejecting the agreement depending on which option benefitted the estate. In addition, if Food Fair had assumed the contract, as Silverstein argues, the brokerage commissions payable after the petition date would be expenses of administration entitled to a first priority under section 64(a)(1) of the Bankruptcy Act. Conversely, if the Court deemed the Brokerage Agreement was not an "executory contract," Silverstein would simply have a claim in these proceedings for breach of contract.

The term "executory contract" in its general legal usage describes a contract that is not fully performed; however, in the bankruptcy context, the term has a more limited meaning. For the purposes of the Bankruptcy Act, the courts have adopted Professor Countryman's definition of an "executory contract" as:

> A contract under which the obligations of *both the bankrupt and the other party to the contract* are so far unperformed that the failure of of either to complete performance would constitute a material breach excusing the performance of the other. (emphasis added)

V. Countryman, *Executory Contracts in Bankruptcy: Part I,* 57 Minn. L. Rev. 439, 460 (1973), *see also Jenson v. Continental Finance Corp.,* 591 F.2d 477, 481 (8th Cir. 1979), *citing, Northwest Airlines, Inc. v. Klinger,* 563 F.2d 916 (8th Cir. 1977); *In re Lake Minnewaska Mountain Houses, Inc.,* 11 B.R. 455 (Bkrtcy. S.D.N.Y. 1981) (J. Schwartzberg); V. Countryman, *Executory Contracts in Bankruptcy: Part II,* 58 Minn. L. Rev. 749 (1974).

An "executory contract" so defined does not encompass the situation where a nonbankrupt party to a contract has rendered full performance of its obligations but where a bankrupt party has performed only partially or not at all.

It would run contrary to the fundamental policies underlying the Bankruptcy Act to extend the statutory option, conferred upon the trustee and debtor in possession, to reject or assume executory contracts to situations where the debtor has already received the contractual benefits and where the sole effect of assuming the contract would be to prefer one general creditor over others whose contracts have not been assumed. V. Countryman, *Executory Contracts in Bankruptcy: Part I,* 57 Minn. L. Rev. 439, 450–52 (1973); *Jenson v. Continental Financial Corp.,* 591 F.2d 477, 481 (8th Cir. 1979); 4A *Collier on Bankruptcy* ¶ 70.43[2] (14th ed. 1976). Assumption of such a contract would convert the breach of contract claim of the nonbankrupt party into an expense of administration without providing any further benefit to the estate.

As previously discussed, the Brokerage Agreement between Food Fair and Silverstein is a distinct, separate agreement from the Sublease between Food Fair and the Subtenant. Neither party to the instant proceeding has alleged that the Sublease expressly incorporates the terms of the Brokerage Agreement or that Silverstein was a party to the Sublease. Although the exercise of the purchase options in the Sublease and Overlease changed the time and manner of Food Fair's payment obligation under the Brokerage Agreement, this fact standing alone does not convert the Brokerage Agreement into an executory contract. It merely shows that the underlying transactions and events are interrelated.

The Brokerage Agreement was entered into shortly after the signing of the Sublease and provided an alternate method of payment in the event the Subtenant exer-

cised the purchase option in the Sublease. The fact that the Brokerage Agreement imposes no affirmative duties on Silverstein yet sets forth the exact terms of Food Fair's payment obligations leads this Court to conclude that Silverstein had fully performed its contractual obligations when it found a subtenant for the Premises.

As the Brokerage Agreement was fully performed on one side prior to bankruptcy, it is not an "executory contract" as the term has been defined for purposes of the Bankruptcy Act. Consequently, the claim of Silverstein for brokerage commissions is a general claim for breach of contract, not an expense of administration.

The conclusions of this Court are supported by two cases cited by Food Fair: *In re Godwin Bevers Co., Inc.*, 575 F.2d 805 (10th Cir. 1978) and *In re Fahys*, 18 F.Supp. 529 (S.D.N.Y. 1937). In *Fahys*, the Court could not address the central issue of whether the trustee or debtor had title to the commissions on insurance policies until it had determined whether the commissions were earned before or after the petition. The policies had been placed by the debtor prior to bankruptcy, but the commissions were payable to the bankrupt on premiums received by the insurance company. The Court found that the commissions "were not 'to be earned in the future.' They had been earned prior to bankruptcy, although not payable until later and then only on a contingency."

*In re Godwin Bevers Co., Inc.* involved the claim of a real estate broker for commissions. The Court found that the broker had fully performed its contractual obligations, providing listing services for the debtor, *prior* to the date of petition even though the sales of some of the properties were not completed until after the bankruptcy proceeding had commenced. The Court held that the broker's claim for commissions was a general unsecured claim and stated that the trustee's implicit acceptance of the benefits of the contract did not transform the nonbankrupt party's contractual claim into an expense of administration.

Accordingly, this Court finds that, notwithstanding the fact that the real estate commissions were payable to Silverstein after the date Food Fair filed its petition, the commissions were earned prior to Food Fair's bankruptcy. Thus, Silverstein's claim is a general unsecured claim for breach of contract, not an expense of administration.

II

Silverstein contends that *In re W.T. Grant Co.*, 4 B.C.D. 503 (Bankr. S.D.N.Y. 1978) (J. Galgay), *aff'd*, 474 F.Supp. 788 (S.D.N.Y. 1979), *aff'd*, 620 F.2d 319 (2d Cir.) *cert. denied*, 446 U.S. 983, 100 S.Ct. 2963, 64 L.Ed.2d 839 (1980) compels this Court to find that the brokerage commissions on the purchase price for the Premises are an expense of administration. Silverstein argues that the decision in *W.T. Grant* was based on the fact that the debtor had received and accepted benefits under the executory contracts of its employees during the post-petition period. Additionally, Silverstein contends that the court "did not give weight to the element that the severance pay claim had, in large measure, accrued *prior* to the date of the filing of the Chapter XI petition."

This Court finds that Silverstein claim in the instant controversy is not analogous those of the employees in *W.T. Grant;* the Brokerage Agreement at bar is not an executory contract within the meaning of the Bankruptcy Act and Food Fair did not receive contractual benefits pursuant to the Brokerage Agreement during the post-petition period. Furthermore, the fact that severance pay was held to be an expense of administration in *W.T. Grant* does not dictate the conclusion that the brokerage commissions are an expense of administration. The decision in *W.T. Grant* turned on the fact that severance pay is "compensation for termination, as opposed to a form of wages that accrues from day to day." *In re W.T. Grant Co.*, 620 F.2d 319, 321 (2d Cir. 1980); *see also Straus-Duparquet, Inc., v. Local Union No. 3 International Brotherhood of Electrical Workers*, 386 F.2d 649 (2d

Cir. 1980); *In the Matter of Unishops, Inc.,* 553 F.2d 305 (2d Cir. 1977).

Thus, in *W.T. Grant,* the severance pay of the employees did not accrue prior to the date of the petition. Consequently, the claim for severance pay in *W.T. Grant* is not comparable to the claim at bar, as this Court has held that the brokerage commissions payable to Silverstein were earned pre-petition.

### III

Silverstein has also argued that it would be inequitable to allow Food Fair "to reap the final benefit of the purchase price under the purchase option" and at the same time be discharged of its obligations under the Brokerage Agreement. In this respect, Silverstein clearly mischaracterizes the transactions among Food Fair, Fairland, and 700 Associates. The purchase price payable to Food Fair under paragraph 49 of the Sublease is equal to the sum Food Fair must pay Fairland under the purchase option in the Overlease.[2] Thus, Food Fair does not receive a positive cash flow from these transactions. At best, it is relieved of the contingent obligation to pay rentals to Fairland if the Subtenant were to terminate or default on the Sublease.

### IV

In conclusion, this Court finds that the claim of Silverstein for real estate brokerage commissions is a general unsecured claim for breach of contract. The Court holds that Silverstein may file a general claim in these proceedings.

It is so ordered.

---

**2.** The Sublease option price for the Premises is $240,862.12. Under the real estate sales contract between Fairland and 700 Associates the sale price of the fee is $245,601.29. The difference is payable to the mortgagee.