## In re PRECISION CARWASH CORP., Debtor.

### Bankruptcy No. 087–70059–21.

United States Bankruptcy Court, E.D. New York.

Aug. 11, 1988.

---

**30.** Trustee's Exhibit K; Tr., September 23, 1986, Vol. I at 37–38.

**31.** *Id.* at 40.

**32.** *Id.* at 42.

**33.** Trustee's Exhibit 25.

**34.** Tr., September 23, 1986, Vol. I at 57.

**35.** *Id.* at 42–43.

**36.** Tr., September 24, 1986, Vol. III at 8.

**37.** *Id.* at 10.

**38.** *Id.* at 14.

Pinks, Brooks, Stern & Arbeit by Robert Arbeit, Hauppauge, N.Y., for debtor.

Otterbourg, Steindler, Houston & Rosen, P.C. by Stuart Gordon, New York City, for Bill Engle Co.

## OPINION

CECELIA H. GOETZ, Bankruptcy Judge:

Precision Carwash Corp. ("Precision" or "Debtor") is moving for summary judgment on its motion to reclassify the claim of William Engle as a general, unsecured claim. William Engle has filed a claim for $50,000 as an administration expense. Reclassification is requested on the ground that the services for which Engle seeks payment were all rendered prior to January 22, 1987, the date on which the Chapter 11 proceeding began, and, therefore, should not be classified as an administration expense covered by Section 503(b) of the Bankruptcy Code.

An objection to a claim is a "contested matter" governed by Bankruptcy Rule 9014, which makes applicable Bankruptcy Rule 7056 which, in turn, makes FRCP 56 applicable. This is a core proceeding because it concerns the "allowance or disallowance of claims against the estate." 28 U.S.C. § 157(b)(2)(B).

In accordance with Local Rule 22(b), the Debtor filed a statement as to the facts which the Debtor deemed not to be in dispute. No answering Rule 22(b) statement was filed by Engle, but in a reply affidavit, Engle claimed a need for discovery as to certain issues,[1] and in a post-hearing "Memorandum of Law in Opposition to Debtor's Motion for Summary Judgment," Engle set forth some additional facts which it describes as undisputed.

---

1. Engle opposed the motion for summary judgment on the ground that it has not had and wishes discovery to establish:

(i) its efforts were responsible for the sale of the Debtor's business to RJAK Enterprises, Inc.; (ii) the Debtor's officers, consultant (John Wolfiser) and its counsel recognized Engle's efforts in causing the sale of the Debtor's assets as well as its contractual right to

compensation; and (iii) the Debtor's counsel recognized, on the record before the Court, the validity of Engle's Chapter 11 administration claim.

Precision concedes (i) and (ii); during the February 24, 1987 hearing debtor's counsel made a statement, quoted p. 36 *infra*, which supports (iii). For the purposes of this motion, all three facts are deemed undisputed.

Accepting as true whatever facts either party claims to be undisputed and supplementing them by the record herein, the critical facts can be briefly stated.

On December 16, 1986, Precision entered into a "Brokerage Agreement" with Engle wherein it committed itself to pay Engle $50,000 if Dr. Alexander Kaganowicz or his assigns purchased Precision's car wash business and property. The agreement provided that: "If a sale is not consummated for any reason whatsoever, the undersigned Broker agrees no Commission shall be due or payable to them."

On December 17, 1986, Dr. Kaganowicz and one Renee Jacobs entered into a contract to buy Precision's business. The contract provided that the closing was to take place on December 30, 1986. Because it was recognized that this date did not allow sufficient time to obtain a title insurance policy, it was agreed that all sums paid pursuant to the agreement, as well as the documents executed pursuant thereto, would be held in escrow until free and clear title could be conveyed.

The closing took place on December 30, 1986, at which time the purchasers delivered $500,000 cash to Precision's attorneys and various deeds, bills of sale, mortgages, chattel mortgages, security agreements were executed, all of which were placed in escrow.

The same day, December 30, 1986, RJAK Enterprises, Inc. ("RJAK") (Dr. Kaganowicz's assign) entered into possession of the premises and since that date has been operating the business formerly belonging to Precision.

On January 22, 1987, Precision filed for relief under Chapter 11. Shortly thereafter it submitted, and the Court signed, an order entitled "Order Scheduling Hearing to Consider Sale of Debtor's Property Pursuant to 11 U.S.C. § 363." [2] The hearing called for by the order was one to "confirm contract and offer made by RJAK" and to consider "other, further, higher or better offers."

At the hearing held on February 24, 1987, Mr. Pinks, Counsel for Precision, in announcing the terms of the sale, added:

I have one more fact that has to be brought before the Court in regard to the figures. Although $1,300,000 is the sale price, the debtor as a result of certain work performed by the broker in an agreements, provide in agreements with the broker which were executed prior to the filing of the petition, is indebted to the broker as a result of this sale in the sum of $50,000, so the net sum that's going to be obtained by Precision as a result of this sale is $1,250,000.

Transcript, 2/24/87, pp. 8–9.

During the course of the hearing the Court first learned the facts regarding the pre-petition transfer of Precision's assets to RJAK and RJAK's continued possession of those assets since December 30th. The Court concluded that under the circumstances it was impossible to proceed with a sale under § 363 and so advised all persons present in the courtroom, saying:

It has developed in the course of investigating this matter that it would [not] be in the best interest ... of the debtor and the creditors of the debtor to proceed with a public sale, because of the commitments, the outstanding commitments to a purchaser now in possession of the premises ...

This Court is authorizing the debtor to assume the contract, the existing contract, that it has with, is it RJAK? RJ & K Enterprises ... And so I thank the people who have come to bid, but I have concluded it's not possible to proceed under the circumstances of this case with a public auction.

Transcript, 2/24/88, pp. 63–64.[3]

However, despite what the Court said at the hearing, the Order subsequently sub-

---

2. Section 363 authorizes a trustee, which includes a debtor-in-possession, to sell property of the estate, other than in the ordinary course of business, after notice and a hearing. Bankruptcy Rule 2002 requires that 20 days notice be given of all creditors of any sale out of the ordinary course of the debtor's business.

3. Section 365(a) of the Code permits the assumption or rejection of outstanding executory

mitted and signed by the Court was captioned "Order Authorizing Sale of Property Free and Clear of Liens." The Order authorized the debtor to sell all its personal and real property to RJAK. The Order said nothing respecting Engle although it directed various disbursements to be made out of the proceeds of the sale. Around April 20, 1987, a title insurance policy was obtained, at which time the escrow terminated and the title documents were recorded.

On November 23, 1987, Engle filed an administration claim in the amount of $50,-000. No objection was made to the claim until May 4, 1988 when the hearing on confirmation of the debtor's plan of reorganization was held.

Engle contends, and the Court accepts as undisputed, that Engle is recognized by Precision as the broker whose efforts were responsible for the sale of the debtor's assets to RJAK. Precision has never moved to assume the contract with Engle.

Because of the priority given administration creditors by § 503(b), recognition of Engle's claim as an administration expense will ensure its payment and at an early date. If it is reclassified as a general pre-petition debt, its payment is speculative, although the debtor's plan calls for payment in full of all its debts.

## DISCUSSION

Precision's motion for summary judgment is limited to requesting reclassification of Engle's claim as a general unsecured claim. Precision has apparently abandoned any effort to expunge the claim in its entirety and, as Engle claims, appears to acknowledge that it is liable to Engle for being the procuring cause of the sale of its assets to RJAK. Therefore, the only question before the Court is whether that $50,-000 debt is entitled to payment ahead of all other debts as an administration claim covered by § 503(b).

Administrative expenses are defined in Section 503(b) of the Bankruptcy Code as

"the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services *rendered after the commencement of the case.*" (Emphasis added).

The reasons underlying the priority given administrative expenses were cogently set forth in *In re Jartran, Inc.,* 732 F.2d 584, 586 (7th Cir.1984):

The policies underlying the provisions of § 503 (and its predecessor, § 64(a)(1) of the Bankruptcy Act, 11 U.S.C. § 104(a)(1) (1976)) are not hard to discern. If a reorganization is to succeed, creditors asked to extend credit after the petition is filed must be given priority so they will be moved to furnish the necessary credit to enable the bankrupt to function. *See In re Mammoth Mart, Inc.,* 536 F.2d 950, 954 (1st Cir.1976) (Coffin, Chief Judge). Thus, "[w]hen third parties are *induced* to supply goods or services to the debtor-in-possession ... the purposes of [§ 503] plainly require that their claims be afforded priority." *Id* (emphasis added; footnote omitted). Without a provision like § 503, efforts to reorganize would be hampered by the necessity of advance payment for all goods and services supplied to the estate since presumably no creditor would willingly assume the status of a non-priority creditor to a debtor undergoing reorganization.

As the same opinion goes on to point out, priority must be denied where to accord it would not further the statutory purpose.

However, because priority should not be afforded unless it is founded on a clear statutory purpose, if the appellants' claim does not comport with the language and underlying purposes of Section 503, their claim must fail.... Any preference for claims not intended by Congress to have priority would dilute the value of the intended priority and thus frustrate the intent of Congress. *Ibid.*[4]

For an expense to be entitled to administrative priority, the creditor's per-

---

contracts by a trustee, which includes a debtor-in-possession, subject to the court's approval.

**4.** The Seventh Circuit's discussion in *Jartran* of the administrative priority is largely derived

formance must be induced by the debtor-in-possession. *Id.* at 587. "A creditor provides consideration for bankrupt's estate only when the debtor-in-possession induces the creditor's performance and performance is then rendered to the estate. If the inducement came from the pre-petition debtor, then consideration was given to that entity rather than to the debtor-in-possession." *In re White Motor Corporation,* 831 F.2d 106, 110 (6th Cir.1987); *In re Jartran, Inc.,* 732 F.2d 584, 586 (7th Cir. 1984). Where the liability for the services in question is irrevocably incurred before the petition is filed, such services are not induced by the debtor-in-possession and do not qualify for administration status.

■ If the liability is incurred pre-petition, the fact that payment may be dependent upon a post-petition contingency is irrelevant. *Denton & Anderson Co. v. Induction Heating Corp.,* 178 F.2d 841 (2d Cir.1949) (Administrative priority denied sales commissions although payment of commissions not due until after orders were filled which did not occur until after the petition was filed); *In re Godwin Bevers Co.,* 575 F.2d 805 (10th Cir.1978) (Administrative priority denied real estate broker despite the fact sale was not complete nor the amount of the fee determined until after the petition was filed); *In re J.M. Fields, Inc.,* 22 B.R. 861 (Bankr.S.D.N.Y. 1982) (Notwithstanding that real estate commissions did not become payable until after petition was filed, the court held that since they were earned prior to the bankruptcy they were a general unsecured claim); *In re The Charter Co.,* 52 B.R. 267 (Bankr.M.D.Fla.1985) (Brokerage fee held earned pre-petition when broker found purchaser ready, willing and able to buy and fact that commission was to be paid at a closing that might occur after the petition was filed was "legally irrelevant" to a de-

termination of when the real estate broker's fee arose); *In re Roberts & Porter,* 54 B.R. 251 (Bankr.N.D.Ill.1985) (Employment agency's commission held to be general unsecured obligation despite the fact that the commission did not become payable until employment lasted 30 days which did not occur until after petition was filed).

■ If a debt is not entitled to administrative priority the debtor or debtor-in-possession cannot by word or deed entitle it to such treatment. If the creditor's services have been fully performed pre-petition and all that remains is the payment of money, the debtor cannot give the debt administrative status by (1) accepting the benefits of the creditor's services; (2) purporting to assume the underlying contract; or (3) entering into a contract post-petition to pay the debt. "Implicit acceptance of the benefits of a contract fully performed by the nonbankrupt neither adds to, nor detracts from, the nonbankrupt's claim or the estate's liability. Acceptance by itself does not convert the claim into an administration expense to the prejudice of the creditors of the bankruptcy estate." *In re Godwin Bevers Co., supra,* 575 F.2d at 807 (citations omitted).

■ Where the non-debtor party to the contract has fully performed so that as to that party the contract is no longer executory, the debtor-in-possession may not by proposing to assume the contract give the debt the status of a priority obligation. The power to assume does not carry with it the power to prefer one general unsecured creditor over another. *In re Moskovic,* 77 B.R. 421, 423 (Bankr.S.D.N.Y.1987); *In re J.M. Fields, supra,* 22 B.R. at 864; *In re The Charter Co., supra,* 52 B.R. at 270.

It would run contrary to the fundamental policies underlying the Bankruptcy Act to extend the statutory option, conferred

from the First Circuit's opinion in *In re Mammoth Mart, Inc.,* 536 F.2d 950 (1st Cir.1976). The fact that the Second Circuit does not agree with the result reached in *Mammoth Mart* i.e., that severance pay is not an administrative expense (*See In re W.T. Grant Co.,* 620 F.2d 319, 321 (2d Cir.) (per curiam), *cert. denied,* 446 U.S. 983, 100 S.Ct. 2963, 64 L.Ed.2d 839 (1980)) does not detract from the authority of the First Circuit's discussion of the tests to be applied in determining whether an expense qualifies for priority, as was recognized by Bankruptcy Judge Galgay of the Southern District of New York in *In re J.M. Fields, Inc.,* 22 B.R. 861 (Bankr.S.D.N.Y.1982). *See also, In re Baths International, Inc.,* 25 B.R. 538 (Bankr.S.D.N.Y. 1982), *aff'd* 31 B.R. 143 (S.D.N.Y.1983); *In re Jartran,* 732 F.2d at 589–90 n. 6.

upon the trustee and debtor in possession, to reject or assume executory contracts to situations where the debtor has already received the contractual benefits and where the sole effect of assuming the contract would be to prefer one general creditor over others whose contracts have not been assumed. V. Countryman, *Executory Contracts in Bankruptcy: Part I,* 57 Minn.L.Rev. 439, 450–52 (1973); *Jenson v. Continental Financial Corp.,* 591 F.2d 477, 481 (8th Cir. 1979); 4A *Collier on Bankruptcy* ¶ 70.43[2] (14th ed. 1976). Assumption of such a contract would convert the breach of contract claim of the nonbankrupt party into an expense of administration without providing any further benefit to the estate.

*In re J.M. Fields, supra,* 22 B.R. at 864.

■ Even the fact that a debtor-in-possession has by contract recognized a pre-petition debt as a post-petition obligation is unavailing to make it such. *In re White Motor Corp., supra,* 831 F.2d at 112. The Sixth Circuit held that the District Court had properly noted the contract entered into post-petition "could not reobligate WMC [the debtor-in-possession] to reimburse ETC [the creditor] for pre-petition expenses. WMC's authority as debtor-in-possession simply did not empower it to alter ETC's non-priority status on its pre-petition claims." The Circuit Court continued:

> The fundamental principle underlying the Bankruptcy Code is that all creditors should be treated equitably and no creditor should receive a distribution disproportionately greater than that received by other members of its class ... ETC will share in the distribution to the same extent as the other general unsecured creditors. Any other treatment of ETC would permit it to receive an inequitably large proportion of the estate's assets in contravention of the bankruptcy laws.

*Ibid.* (citations omitted).

These basic principles underlie the denial of administrative priority to claims like those advanced by Engle here. *In re Godwin Bevers Co., supra* (brokerage commis-

sion); *In re Gardinier,* 831 F.2d 974 (11th Cir.1987) (brokerage commission); *In re Moskovic, supra* (brokerage fee); *In re J.M. Fields, supra,* (brokerage fee); *In re The Charter Co., supra* (brokerage fee) *Denton & Anderson Co. v. Induction Heating Corp., supra,* (sales commissions); *In re Jartran, supra,* (Yellow Book advertising); *In re White Motor Corp., supra,* (post-petition expenses incurred in completing contract entered into pre-petition); *In re Baths International, Inc.,* 31 B.R. 143 (S.D.N.Y.1983), *affirming* 25 B.R. 538 (Bankr.S.D.N.Y.1982) (Yellow Book advertising); *Roberts & Porter, Inc., supra,* (commission due employment agency contingent upon employee remaining employed 30 days which occurred post-petition).

The facts in these cases parallel, with minor variations, those present here. In *In re Moskovic, supra,* the trustee likewise applied to the Court for an order permitting him to sell the real estate owned by the debtor and his wife to the purchaser named in a pre-petition contract of sale. He advised the Court that the broker which had procured the sale would seek the sum of $9,600 as real estate commissions pursuant to a separate brokerage agreement. Bankruptcy Judge Schwartzberg of the Southern District of New York held that the broker was an unsecured general creditor not entitled to be paid out of the proceeds of the sale. Judge Schwartzberg refused the application of the broker to approve his agreement *nunc pro tunc,* saying:

> When the Debtor did file his Chapter 7 petition on July 12, 1986, the broker had already earned the claimed brokerage commissions because a ready, willing and able purchaser had been obtained. The brokerage contract was no longer executory because the broker then had a general unsecured claim for brokerage commissions ... The broker had already performed the brokerage services for the debtor and his wife before the Chapter 7 petition was filed.

*In re Moskovic,* 77 B.R. at 423.

In *In re The Charter Co., supra,* a real estate broker moved to compel the trustee

to assume the brokerage agreement made earlier with the debtor. The court held that because the broker had secured a buyer ready, willing and able to perform before the bankruptcy petition was filed, the brokerage agreement was no longer executory and was incapable of being assumed, or rejected, pursuant to § 365. Although the broker was entitled to its commission because it was the procuring cause of the ultimate sale made pre-petition, it was denied administrative priority. The Court said, *inter alia:* "One who fully performs under a contract prior to the Filing Date is not entitled to an administrative expense, even though his services may result in a direct benefit to the estate after the Filing date." 52 B.R. at 270.

The only case which has reached a conclusion contrary to the decisions just discussed is *Matter of Steelship Corp.,* 576 F.2d 128 (8th Cir.1978), relied on heavily by Engle. In *Steelship,* the court held that a trustee who assumed a contract for the sale of the assets of the business necessarily also assumed the agreement to pay brokerage which was part of the same document. The Court said: "It is well settled that the trustee cannot accept the benefits of an executory contract without assuming its burdens as well." 576 F.2d at 132. The decision rests on the unstated premise that the purchase and sale agreement and the brokerage agreement were all one contract so that assumption of the benefits of the former meant assumption of the liabilities of the latter.

In a carefully reasoned opinion, Judge Alexander L. Paskay, Chief Judge of the Bankruptcy Court of the Middle District of Florida, held on similar facts that the brokerage agreement was distinct and separately enforceable from the purchase and sale agreement and, therefore, by accepting the benefits of the purchase and sale agreement, the debtor did not assume the brokerage agreement. *In re Gardinier, Inc.,* 50 B.R. 491 (Bankr.M.D.Fla.1985). Judge Paskay was sustained in his position by the Eleventh Circuit which reversed the district court which had disagreed. *In re Gardinier,* 831 F.2d 974 (11th Cir.1987). The Eleventh Circuit concluded that the brokerage agreement and the contract of sale were two independent contracts despite the fact that they were part of the same document because (1) one agreement addressed the sale of property, while the other contemplated an employment contract relating to the sale of the property; (2) the consideration for each contract was separate and distinct with no consideration flowing between the broker and the buyer; (3) the obligations of each party were not interrelated, that is, there were no promises running between the broker and the purchaser, their only relationship being that each had separate contractual rights with the seller.

The Eleventh Circuit found *Steelship* not "persuasive" because, it said, "The precise issue we face—whether the brokerage agreement was separate and distinct from the purchase and sale agreement—was not presented to the court in *Steelship.*" 831 F.2d at 978 n. 7. The Eleventh Circuit found it unnecessary to its decision to reach the issue as to whether or not the brokerage agreement was a non-executory agreement and therefore incapable of being assumed as Judge Paskay had held. *In re Gardinier, supra,* 831 F.2d at 975 n. 2. However, Bankruptcy Judge Schwartzberg, in circumstances strikingly parallel to those present here, agreed with Bankruptcy Judge Paskay that when payment of money was all that remained for the debtor to perform post-petition, the brokerage agreement could not be treated as executory and, therefore, assumable by a debtor or trustee in bankruptcy. *In re Moskovic, supra,* 77 B.R. at 423.

 Application of the governing principles is fatal to Engle's claim to be entitled to an administrative priority. In the present case, unlike the *Steelship* case, there can be no question but that the debtor's agreement to pay a brokerage commission and the debtor's contract of sale with Dr. Kaganowicz are two separate and distinct agreements. Unlike the *Steelship* case, they are not part of the same document; they were made on different dates; and for all the reasons relied on by the Eleventh Circuit in *Gardinier* must be

deemed two distinct agreements. This means that Precision did not assume the liabilities of the separate and distinct contract with Engle by availing itself of the benefits of the contract of sale to RJAK under § 363 or § 365. That separate agreement was never assumed, nor could it have been assumed, because it was fully executed when the bankruptcy petition was filed.

No matter how Mr. Pinks, the attorney for Precision, described Engle's right to a brokerage fee, no matter what commitments Precision, or its agents and representatives made to Engle, subsequent to the time Precision became a debtor-in-possession, neither Precision nor its attorneys had the authority or the power to prefer Engle over other general creditors or entitle Engle to receive a distribution disproportionately greater than that received by other members of the same class. Pinks' statements may be binding on the debtor; they are not binding on the debtor's creditors or the court. As the Sixth Circuit held in *White Motor Co.*, a debtor cannot even by written contract elevate the status of a pre-petition general claim to an administration claim. *A fortiori*, statements on the record are inadequate for that purpose.

As for Engle's claimed reliance on the statements of Mr. Pinks, Engle does not, and cannot, show that it either acted, or failed to act, due to such statements. All of Engle's services were performed well before Precision became a debtor-in-possession, giving rise to the division of its debts between administrative and pre-petition general obligations and, therefore, long before Mr. Pinks could make any statements as to the priority of the debt created. At the time of performance Engle could not have relied on statements not yet made. After the petition was filed, the status of the debt as a general unsecured obligation was fixed and there was nothing that Engle could, or could not, do that would have changed that status, regardless what reliance it placed on Mr. Pinks.

For the foregoing reasons, summary judgment is entered in favor of the debtor-in-possession and Engle's claim is reclassified as a general unsecured claim, not an administration claim.

Settle Order.