**In re CHATEAUGAY CORPORATION, Reomar, Inc., the LTV Corporation, et al., Debtors.**

**In re LTV STEEL COMPANY INC., Debtor.**

**In re LTV STEEL TUBULAR PRODUCTS COMPANY, Debtor.**

**Bankruptcy Nos. 86 B 11270(BRL)–86 B 11334(BRL), 86 B 11402(BRL), 86 B 11464(BRL).**

United States Bankruptcy Court, S.D. New York.

June 29, 1989.

Levin & Weintraub & Crames (Marc Abrams and Steven Fox, of counsel), Davis Polk & Wardwell (John D'Angelo, of counsel), New York City, for debtors.

Stroock & Stroock & Lavan, New York City, for Steel Creditors Committee (Mark Speiser, of counsel).

Wachtell, Lipton, Rosen & Katz, New York City, for Official Committee of Unsecured Steel Creditors (Harold S. Novikoff, of counsel).

Friedman, Wang & Bleiberg, P.C. (Arthur S. Friedman, of counsel), Shea & Gould (Martin Shelton, Michael Emrich and Glenn Siegel, of counsel), New York City, for Frito–Lay, Inc.

## DECISION ON MOTION FOR SUMMARY JUDGMENT

BURTON R. LIFLAND, Chief Judge.

### INTRODUCTION

The main issue presently before the Court appears to be a question of first impression as to whether Safe Harbor Leasing transactions or Tax Benefit Trans-

fer Agreements are executory contracts or unexpired leases which are capable of being assumed or rejected under § 365 of the Bankruptcy Code. This unique form of transaction, although short-lived in terms of the Internal Revenue Code, has numerous consequences in a bankruptcy reorganization which perhaps were never contemplated at the time of its enactment.

## BACKGROUND

On July 17, 1986 (the "Filing Date") and thereafter, the LTV Corporation ("LTV") and sixty-six of its affiliates (collectively, the "Debtors") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code (the "Code"). Since the Filing Date, the Debtors have been continued in the management and operation of their respective businesses and properties as debtors-in-possession pursuant to §§ 1107 and 1108 of the Code. The Debtors' Chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to orders of this Court. No trustee or examiner has been appointed in any of the Debtors' Chapter 11 cases.

The Debtors are a large and highly complex group of companies principally engaged in the steel, aerospace/defense and energy products industries. LTV Steel is a major producer of hot and cold rolled sheets for the automotive and consumer durable goods markets and has been a major producer of high quality bar products [1]. LTV Steel is one of the largest steelmakers in the United States as a result of LTV's June 29, 1984 acquisition of Republic, and the subsequent merger of J & L Steel, a former wholly-owned subsidiary of LTV, into Republic (the surviving corporation thereafter being renamed LTV Steel).

On January 23, 1989, the Debtors filed a motion objecting (the "Objection"), pursuant to §§ 501 and 502 of the Code and Bankruptcy Rule 3007, to the allowance of proofs of claim filed in these cases on November 25, 1987 by Ainwick Corp., Frito Lay, Inc. and FL Holding, Inc., (collectively, "Frito–Lay" and the "Frito–Lay Claims") in connection with various Safe Harbor Lease, or tax benefit transfer agreements ("TBT Agreements"), between Frito–Lay and certain of the Debtors (the "Frito–Lay TBT Agreements").[2]

The Frito–Lay Claims in question relate to various Frito–Lay TBT Agreements in which pursuant to certain of the agreements, LTV Steel agreed to indemnify Frito–Lay against certain losses, including losses resulting from the acceleration of taxable income as a consequence of certain triggering events described in the Frito–Lay Agreements (an "Indemnity Loss"). Debtors allege in their Statement pursuant to Local Bankruptcy Rule 13(h) ("Debtors' 13(h) Statement")[3], that: (1) Between November 6, 1981 and December 23, 1982, LTV Steel entered into twenty-four separate TBT Agreements with Frito–Lay in connection with LTV Steel's acquisition of and investment in more than $520 million, adjusted basis (original cost), of capital equipment (the "TBT Assets") located at one or more of eighteen separate LTV Steel production facilities, including LTV Steel's Buffalo, New York facilities (the "Buffalo Works").[4] (2) On January 17, 1984, pursuant to the terms of LTV Steel's collective bargaining agreement with the

---

**1.** This Court approved Debtors motion for the sale of its bar division earlier this month.

**2.** On February 27, 1989, Frito–Lay filed five additional proofs of claims (the "1989 Claims.")

**3.** Local Bankruptcy Rule 13(h) provides that upon a motion for summary judgment the moving party is required to submit "a separate, short and concise statement of the material facts as to which the moving party contends there is no genuine issue to be tried." The party opposing a motion for summary judgment must include "a separate, short and concise statement of the material facts as to which it is contended that there exists a genuine issue to be tried."

Rule 13(h) further provides that "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party.

**4.** Frito–Lay represents in its Application In Support Of Cross–Motion Seeking Payment Of Administrative Expense And In Opposition To Objection By Debtors To Allowance Of Frito–Lay TBT Claims at para. 7, that there are twenty-five TBT Agreements.

United Steel Workers of America, LTV Steel permanently terminated all steel production operations and activities at its Buffalo Works for certain labor-related purposes.[5] (3) On November 18, 1987, LTV Steel permanently retired the Buffalo Works for all purposes, including steel-making.[6] (4) Beginning in December 1987, LTV Steel contracted for removal of asbestos, PCB transformers and other materials as the first step in the demolition of the Buffalo Works.[7] The process of demolishing the physical facilities of the Buffalo Works began in July 1988. Demolition activities continued throughout the remainder of 1988 and are still in progress as of the date hereof. And (5) it is presently projected that demolition activities at the Buffalo Works will be completed prior to December 31, 1989.[8] Debtors argue that whether or not the permanent retirement of the Buffalo Works and the resulting demolition activity described above triggered, or will result in the triggering of, fixed and liquidated Indemnity Losses under various Frito–Lay TBT Agreements, any such claims constitute general unsecured claims against the estate of LTV Steel.[9]

Thus, the Debtors seek pursuant to their Objection, for the entry of an order which determines that as a matter of law: (i) the Frito–Lay TBT Agreements do not constitute executory contracts or unexpired leases under § 365 of the Code, and (ii) the Frito–Lay Claims are pre-petition general unsecured claims that are not entitled to priority treatment under §§ 503 and 507 of the Code, as well as the entry of a scheduling order establishing procedures for the conduct of discovery in connection with the Objection and fixing a date and time for a hearing on the Objection at which the

Court would liquidate and estimate the Frito Lay Claims. On March 20, 1989, the Debtors filed an amended objection which supersedes the prior Objection (the "Amended Objection"). The Amended Objection narrows the scope of the relief sought in the Objection by focusing only on the executory and administrative expense issues, and further objects to the newly filed 1989 Claims.

Pursuant to a separate motion, also dated March 20, 1989, Debtors move for partial summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, (the "Federal Rules") made applicable herein pursuant to Bankruptcy Rule 9014, in connection with the Debtors' Amended Objection. Debtors seek a determination that, as a matter of law: (i) the Frito–Lay Agreements pertaining to assets located, or previously located, at the Buffalo Works do not constitute executory contracts or unexpired leases which are susceptible to assumption or rejection under § 365 of the Code, and (ii) any Indemnity Loss claim of Frito–Lay associated with Frito–Lay TBT Agreements relating to the Buffalo Works is a general unsecured claim which is not entitled to priority treatment under §§ 503 and 507 of the Code. Thus, Debtors allege that no genuine issue of material fact exists and therefore, pursuant to Federal Rule 56(a) they are entitled to a grant of partial summary judgment, as a matter of law.

In contrast, Frito–Lay filed its Opposition to the Debtors' Objection which seeks the entry of an order (a) pursuant to § 503(a) of the Code, and former § 168(f)(8) of Title 26 of the United States Code (the "Internal Revenue Code" or "IRC") as en-

---

**5.** Pursuant to Frito–Lay's Statement Pursuant to Local Bankruptcy Rule 13(h) ("Frito–Lay's 13(h) Statement") Frito–Lay states that it is neither able to controvert nor affirm Debtors' preceding statement.

**6.** Pursuant to Frito–Lay's 13(h) Statement, Frito–Lay controverts the preceding material facts set forth in Debtor's 13(h) Statement.

**7.** Pursuant to Frito–Lay's 13(h) Statement, Frito–Lay controverts the preceding material facts set forth in Debtor's 13(h) Statement.

**8.** Pursuant to Frito–Lay's 13(h) Statement, Frito–Lay states that it is neither able to controvert nor affirm Debtors' preceding statement.

**9.** It should be noted that the issue as to what constitutes a triggering or disqualifying event under the tax law need not be determined at this juncture.

acted by the Economic Recovery Tax Act of 1981 ("ERTA"), mandating payment by LTV of the administrative expenses it owes to Frito–Lay with respect to those alleged re-purchases of TBT property by LTV by reason of reported disqualifying events which have thus far led to accrued claims against the Debtors and (b) finding that Frito–Lay may require that future transfers of TBT property be made subject to the TBT Agreements. Additionally, in a yet to be filed Cross–Motion, Frito–Lay will allegedly seek an order (a) pursuant to § 503(a) of the Code, and former IRC § 168(f)(8) (as enacted by ERTA) mandating payment by LTV of the administrative expenses it owes to Frito–Lay by reason of those disqualifying events resulting in benefit to LTV and harm to Frito–Lay, which have thus far led to post-petition accrued claims against the Debtors; and (b) for such other and further relief which this Court may deem just and proper.

However, the only matters presently before the Court, (see, Transcript ("TR.") at 6–10, 65–7), are those narrow issues outlined in Debtors' Partial Summary Judgment Motion which are as follows:

I. Whether the Frito–Lay TBT Agreements are executory contracts or unexpired leases under § 365 of the Code.

A. Whether the Frito–Lay TBT Agreements are true "leases" for purposes of § 365 of the Code.

B. Whether the Frito–Lay TBT Agreements represent executory contracts for the purposes of § 365 of the Code.

II. Whether the Indemnity Loss claims being asserted by Frito–Lay, whether or not fixed or liquidated, are pre-petition general unsecured claims which are not entitled to priority.

III. Whether the Debtors are entitled to partial summary judgment in connection with the Objection and consistent with its Summary Judgment Motion.

## TBT AGREEMENTS GENERALLY

In 1981 Congress, in a short-lived experiment with the tax laws, enacted the Economic Recovery Tax Act of 1981 ("ERTA"), Pu 97–34, 95 Stat. 172 (1982) including the now repealed provisions of Internal Revenue Code ("IRC") § 168(f)(8), which, together with a temporary regulation adopted thereunder (Temp.Treas.Reg. § 5c.168(f)(8), *et seq.*), provided for TBT or safe harbor leasing transactions. The provisions of ERTA which provided for safe harbor leasing were repealed by the Tax Equity and Financial Responsibility Act of 1982 ("TEFRA"); Pub.L. No. 97–248.

TBT Agreements involve the transfer of the federal income tax attributes of qualified property to a party better able to utilize such tax benefits as an offset against its own federal income tax liability. The attributes transferred, normally through the vehicle of a nominal sale-leaseback transaction include (i) Accelerated Cost Recovery System ("ACRS") deductions, *i.e.*, depreciation, (ii) an investment tax credit ("ITC"), and (iii) an energy tax credit ("ETC"). These transactions neither had, nor were they required to have, a business purpose other than the transfer of tax benefits and, therefore, departed widely from prior and current law. *See*, Warren & Aurbach, *Transferability of Tax Incentives and the Fiction of Safe Harbor Leasing*, 95 Harv.L.Rev. 1752, 1762–1763 (1982) (hereinafter "Warren & Aurbach"); Toy, *Representing the "For Tax Purposes Only" Lessor in the Reorganization of Its Lessee*, 58 Am.Bankr.L.J. 253, 254 (1984) (hereinafter "Toy").

In the typical Safe Harbor Lease, the owner of qualified TBT property transfers the tax attributes of such property to a purchaser in return for a one-time cash payment and a nonrecourse installment obligation of the purchaser. Contemporaneously, the purchaser (the "Tax Lessor") leases the qualified TBT property back to the transferor (the "Tax Lessee") for use in the Tax Lessee's business. This "sale-leaseback" transaction is nominal only; no traditional attributes of ownership pass, or are passed, by the Tax Lessee to the Tax Lessor under applicable non-bankruptcy law. Consequently, characterization of the transaction as a "sale-lease" is fictitious.

(Warren & Aurbach, 95 Harv.L.Rev. at 1762.)

The so-called sale of qualified TBT property is generally made for an amount equal to or approximating the qualified TBT property's adjusted basis (original cost) at the time the property is put into service. As previously noted, payment of the aggregate sale price of the qualified TBT property (in reality, the tax attributes thereof) is made by the Tax Lessor through (i) an initial cash payment, plus (ii) an installment note or other nonrecourse long-term payment obligation of the Tax Lessor.

The Tax Lessor's initial payment or investment is generally equal to the present value of the ACRS, ITC and ETC tax benefits it expects to receive under the Safe Harbor Lease, less (i) the present value of any additional taxable income recognition required as a result of the TBT, such as the excess over time of any periodic rental income over any corresponding principal and interest deductions, and (ii) a profit component or return on investment, which aggregate amount necessarily varies from transaction to transaction depending upon the term of the lease, the interest and amortization rates on the installment and the discount rate used to evaluate cash flows. (Warren & Aurbach, 95 Harv.L. Rev. at 1763–64; Toy, 58 Am.Bankr.L.J. at 254.)

The remainder of the qualified TBT property's purchase price is typically financed by a nonrecourse "loan" from the Tax Lessee to the Tax Lessor, represented by an installment obligation, which fictional loan is repaid over the term of the lease, (generally on a quarterly basis), with both principal and interest components.

The typical Safe Harbor Lease also provides for periodic, generally quarterly, "rental" payments from the Tax Lessee to the Tax Lessor for the life of the lease. These rental payments are designed to exactly offset the Tax Lessor's installment loan obligations, both in timing and amount. Consequently, the only cash that actually changes hands in the typical Safe Harbor Lease is the initial cash payment relating to the present value of the tax benefits being transferred; the so-called loan is fictional, as are the lease and the periodic rental payment obligations arising thereunder.

Since the motivation behind the Safe Harbor Lease is the transfer of tax benefits, the Tax Lessee will generally agree, in effect, to indemnify the Tax Lessor against (i) a failure by the Safe Harbor Lease to confer to the Tax Lessor the tax benefits being transferred, or (ii) an early receipt of taxable income in the form of accelerated rental installments net of interest deductions under the nonrecourse note (heretofore defined as an "Indemnity Loss"), as a consequence of certain triggering events described in such agreements. (Toy, 58 Am.Bankr.L.J. at 254.) This indemnity, which is designed to make the Tax Lessor whole, includes a "gross-up" component to account for any increased tax liability incurred by the Tax Lessor upon its receipt of any indemnification payment. In addition, it is not uncommon for a Tax Lessee to agree to further indemnify the Tax Lessor for (i) any general non-tax related liabilities, *e.g.*, liabilities arising from personal injuries occurring in connection with the Tax Lessee's use or possession of the qualified TBT property, (ii) any general tax related liabilities, *e.g.*, state or local income, sales or property tax liability incurred by the Tax Lessor in connection with the Safe Harbor Lease, and (iii) any loss occasioned from casualty occurrence. Furthermore, in many instances Tax Lessors will insist that a Tax Lessee provide it with security, generally in the form of irrevocable letters of credit, to insure the payment of the Tax Lessee's contingent indemnity obligations. The indemnity obligations represent the Tax Lessor's bargained-for claim in the event of a triggering event.

Lastly, the typical Safe Harbor Lease will generally contain a repurchase option exercisable at the conclusion of the lease term. More specifically, the Tax Lessee has the option to reassume "ownership" of the qualified TBT property for federal income tax purposes. The repurchase option exercise price is often set at a nominal amount, reflecting the fair market value of

the remaining tax benefits at the end of the lease term.

## THE LTV STEEL TBT AGREEMENTS WITH FRITO–LAY

As stated previously, during the period commencing November 6, 1981 through and including December 23, 1982, LTV Steel, through its predecessors Republic and J & L Steel, entered into approximately twenty-four TBT Agreements with Frito–Lay relating to the acquisition of TBT Assets with an aggregate adjusted basis (original cost) exceeding $520 million located at one or more of eighteen separate LTV Steel production facilities, including the Buffalo Works. (*See*, Debtors' 13(h) Statement at para. 1).

As an illustration, a brief abstract of a typical LTV Steel TBT Agreement with Frito–Lay is set forth below.

The TBT Agreement between Republic (as predecessor to LTV Steel) and Frito–Lay, Inc., dated October 12, 1982 (the "Agreement" or the "Frito–Lay Agreement") and the TBT Agreement between J & L Steel (as predecessor to LTV Steel) and Ainwick Corp., dated November 12, 1981 are alleged to be fairly representative, in structure and substance, of all the Frito–Lay TBT Agreements with LTV Steel. (*See*, Affidavit of Marvin A. Kunde, Esq.).[10] The Frito–Lay Agreement provides, in pertinent part as follows:

(i) *Parties' Characterization of Agreement; Parties.*

The parties mutually agree to characterize the Agreement as a "lease", and each other as "lessor" and "lessee", respectively, solely for purposes of the now repealed Safe Harbor Lease provisions. *See*, Frito–Lay Agreement, § 2.01 at p. 6.

(ii) *Sale and Acquisition of Equipment For Tax Purposes.*

Pursuant to the Agreement, Lessee (LTV Steel) sells and transfers to Lessor (Frito–Lay), and Lessor acquires from Lessee, each of the Frito–Lay Assets speci-

fied in either Schedule A or Schedule B to the Agreement. The sale and acquisition of the Frito–Lay TBT Assets is "[s]olely for Federal tax law purposes." Furthermore, the parties expressly agree that the sale and transfer of the Frito–Lay TBT Assets shall be limited to the extent necessary to have the Agreement qualify as a Safe Harbor Lease. *See*, Frito–Lay Agreement, § 5.01 at p. 13.

(iii) *Purchase Price.*

The purchase price (the "Price") of the Frito–Lay TBT Assets' tax benefits—which represents the consideration bargained for and received by LTV Steel—is based upon the Lessee's aggregate adjusted basis (original cost) in the Frito–Lay TBT Assets and equals $7,303,774. Payments of the Price is effectuated by (a) an initial cash payment of $2,596,254, paid simultaneously with the execution of the Agreement, and represents approximately 35.5% of the Price, and (b) a nonrecourse "loan" by the Lessee to the Lessor for the aggregate unpaid balance of $4,707,520, repayable in ninety equal installments, contingent upon and subject to direct offset against the Lessee's periodic rental payment obligations. The unpaid balance of the installment loan bears interest at the contract rate of 23% per annum, as dictated by applicable IRS rules and regulations. *See*, Frito–Lay Agreement, §§ 5.01, 5.03 and 7.02 at pp. 14–15, 22.

(iv) *Lease of Equipment for Tax Purposes.*

To the extent necessary to have the Agreement qualify as a Safe Harbor Lease, Lessee agrees to "lease" the Frito–Lay TBT Assets from Lessor, and to make ninety equal quarterly rental payments, subject to direct offset against Lessor's quarterly installment loan repayments. *See*, Frito–Lay Agreement, §§ 6.01, 6.02 and 7.02 at pp. 19–20, 22–3.

(v) *Term of Agreement.*

---

**10.** Frito–Lay is willing to assume, without conceding, that such documents are representative of Frito–Lay's TBT Agreements. (*See*, Opposition And Affidavits of Frito–Lay To Motion By

Debtors Seeking Partial Summary Judgment In Connection With Debtors' Amended Motion Objecting To The Frito–Lay TBT Claims at para. 9).

The Agreement has a lease term which commences on the Effective Date (as defined therein) and which ends on the Lease Termination Date. The term "Lease Termination Date" is defined to mean, as to an item of property, the date which is twenty-two and one-half years after the Effective Date, or such earlier date on which the Agreement fails or ceases to be treated as a lease with respect to such item of property. The Agreement further provides that, at the expiration or other termination of the Lease Term, LTV Steel shall be entitled to retain the cash component of the Price, the obligations of LTV Steel and Frito–Lay to respectively pay rent and repay the loan shall terminate, any and all rights transferred to Frito–Lay pursuant to the Agreement (consisting solely of rights to federal income tax deductions and credits) shall be of no further force or effect. *See,* Frito–Lay Agreement, §§ 8.01 and 8.02.

(vi) *Indemnification Obligations.*

The Agreement contains both general casualty occurrence and tax indemnities. In addition, the Agreement provides that LTV Steel will indemnify Frito–Lay, under prescribed circumstances that, for failure of the Agreement to confer upon Frito–Lay the tax benefits being transferred under the Agreement as a result of the disqualification of the Agreement as a qualified Safe Harbor Lease. There is no covenant whereby LTV Steel agrees to refrain from activities which give rise to an Indemnity Loss. LTV Steel was at all times and remains in control of the Frito–Lay TBT Assets (with the exception of those Frito–Lay Assets actually sold by it prior hereto, unrestricted by the Frito–Lay Agreements.

The Lessee's Indemnity Loss exposure varies depending upon whether the Lessor is denied the benefit of all of the tax benefits being transferred or only a portion thereof. With respect to the former, the Lessee's indemnity obligation is calculated by multiplying a ratable portion of the Price by the applicable percentage set forth in a stipulated loss schedule (the "Stipulated Loss Schedule") made part of the Agreement. In the case of the latter, the Lessee's indemnity obligation is equal to the sum of (i) the discounted present value of the amount of additional taxes that are payable by the Lessor as a result of the Indemnity Loss (discounted at the contract rate of 8.1% per annum), as set forth in the relevant Stipulated Loss Schedules, and (ii) and interest, penalties or fined payable by the Lessor. *See,* Frito–Lay Agreement, §§ 9.01 and 9.02 at pp. 24–33. Section 19.09 (Exclusive Remedies) provides that the indemnification provisions of Articles IX and XI are Frito–Lay's exclusive remedies in the event Republic (LTV Steel) shall fail to perform or observe any covenant, agreement or condition set forth on the Agreement.

(vii) *Sale of TBT Asset.*

The temporary treasury regulation provides that a voluntary transfer of qualified TBT property by a lessee terminates treatment of the transaction as a lease for federal income tax purposes and triggers recapture to the Tax Lessor unless the transferee consents "to take the property subject to the lease." *See,* Temp.Treas.Reg. § 5.c.168(f)(8)–2(a)(5), 8(d), 8(e). The Frito–Lay Agreement provides that in the event LTV Steel shall sell and convey a Frito–Lay TBT Asset without making the sale "subject to" the Agreement, Frito–Lay shall have an indemnification claim. *See,* Frito–Lay Agreement, §§ 9.02(b)(iv) and 10.02.

## DISCUSSION

This Court has jurisdiction of this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the "Standing Order of Referral of Cases to Bankruptcy Judges" of the United States District Court for the Southern District of New York, dated July 10, 1984 (Ward, Acting C.J.). Venue of the Debtors' Chapter 11 cases and this Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

ISSUE I. *The Frito–Lay TBT Agreements Are Not Executory Contracts Or Unexpired Leases Under § 365 Of The Bankruptcy Code.*

## A. THE FRITO-LAY TBT AGREEMENTS ARE NOT TRUE "LEASES" FOR PURPOSES OF § 365 OF THE BANKRUPTCY CODE.

 Section 365 of the Code authorizes a debtor-in-possession, subject to court approval, to assume or reject executory contracts or unexpired leases. In order to determine whether the Frito-Lay TBT Agreements are true "leases" or simply executed contracts for the transfer of a Frito-Lay TBT Asset's tax attributes only, this Court must examine the intent of the parties, the circumstances surrounding their negotiations, and the economic substance of the final transaction. The mere form in which a particular transaction is cast is not controlling and thus, this Court is not bound either by the parties' characterization of the transaction as a lease or by the terminology (*e.g.*, "rent", "lessee", "lessor") contained therein. In contrast, courts have adopted an objective standard under which form yields to substance. *See, In re PCH Assocs.*, 55 B.R. 273, 280–81 (Bankr.S.D.N.Y.1985), *aff'd*, 60 B.R. 870 (S.D.N.Y.1986), *aff'd*, 804 F.2d 193, 198–201 (2d Cir.1986); *In re Beker Indus.*, 69 B.R. 937, 939 (Bankr.S.D.N.Y.1987).

In *In re Samoset Assocs.*, 24 U.C.C.Rept. Serv. 510 (Bankr.D.Me.1978), for example, the Court stated "although the instrument itself contains the express acknowledgement of the parties that the agreement constitutes a true lease, conclusory incantations at variance with its manifest operative effect cannot foreclose further judicial inquiry." *Id.* at 512–13. Moreover, "[w]hether a 'lease' is [sic] true or *bona fide* lease or, in the alternative, a financing 'lease' or a lease intended as security, depends upon the circumstances of each case. The distinction between a true lease and a financing transaction is based upon the economic substance of the transaction and not, for example, upon the locus of title, the form of the transaction or the fact that the transaction is denominated as a 'lease' ". *See,* S.Rep. No. 989, 95th Cong., 2d Sess. 62–5 (1978), U.S.Code Cong. & Admin.News 1978, p. 5787; *see also, Helvering v. Lazarus & Co.*, 308 U.S. 252, 254–55, 60 S.Ct. 209, 210–11, 84 L.Ed. 226 (1939); *In re*

*PCH Assocs.*, 804 F.2d at 198–201; *Sun Oil Co. v. CIR*, 562 F.2d 258, 263 (3d Cir. 1977), *cert. denied*, 436 U.S. 944, 98 S.Ct. 2845, 56 L.Ed.2d 785 (1978); *In re Anton's Lounge & Restaurant, Inc.*, 40 B.R. 134, 136 (Bankr.E.D.Mich.1984); *In re Candy Lane Corp.*, 38 B.R. 571, 575–76 (Bankr.S. D.N.Y.1984); *In re Winston Mills, Inc.*, 6 B.R. 587, 596–97 (Bankr.S.D.N.Y.1980).

 Furthermore, in determining the economic reality of a transaction labeled a "sale-leaseback", the court is required to consider "whether the leaseback actually transfers the normal risks and responsibilities of lessor status...." *In re Nite Lite Inns*, 13 B.R. 900, 908 (Bankr.S.D.Cal. 1981). In the case of Safe Harbor Leases in general, and the Frito-Lay TBT Agreements specifically, all the material indicia of ownership of the Frito-Lay Assets remain vested in LTV and are not, nor are they ever intended to be transferred to Frito-Lay. Thus, it can be concluded that the Frito-Lay TBT Agreements do not constitute true sale-leasebacks.

Although it is true that the federal regulations describe these transactions as "safe harbor leases", this terminology does not necessarily imply that the contracts constitute real leases. In fact, a review of both the legislative history and the various commentators on this subject leads this Court to the conclusion that the reference to the term "lease" is illusory. For example, the legislative history accompanying TEFRA states as follows:

A safe harbor lease does not have to have any economic substance as a lease. It is a paper transaction ... a mere transfer of [tax] benefits. It used to be that a lease had to show a positive cash flow as well as profit, and the lessor had to actually own the equipment as well as have a minimum investment in the property. Safe harbor leasing repealed these sensible rules.

1982 U.S.Code Cong. & Admin.News 1143 at 430 (statements of Sen. Armstrong). Moreover, commentators have characterized Safe Harbor Leases as follows:

This transaction [Safe Harbor Lease] need be a sale only for federal income tax purposes; no attribute of ownership need pass to the Lessor under local law. Ownership status for the Lessor and characterization of the transaction as a lease are thus fictitious....

Warren & Aurbach, 95 Harv.L.Rev. at 1762. In addition:

It is clear that under the Bankruptcy Code, state law controls whether or not the relationship between a party and the debtor is to be characterized as a lease. In this regard, it is equally clear that the TBT transaction is not a lease for state law (and thus section 365) purposes.... The lessor in a TBT transaction can obtain none of the benefits accorded lessors by section 365 of the Bankruptcy Code.

Toy, 58 Am.Bankr.L.J. at 255 (footnotes omitted.)

Finally, an examination of the terms of the Frito–Lay TBT Agreements themselves demonstrates that they expressly provide that the transfer of the Frito–Lay TBT Assets is for federal income tax purposes only, and that neither title nor possession is intended to, or will ever, be transferred to or conferred upon Frito–Lay by LTV Steel. In addition, the Frito–Lay TBT Agreements provide that any reversion vests in LTV Steel, a characteristic which is completely at odds with traditional lease law. These TBT Agreements also provide that the Lessee (LTV Steel), in addition to retaining title to, and possession of, the Frito–Lay TBT Assets, shall retain other responsibilities incident to ownership, including *inter alia*, the duty to (i) pay all taxes, assessments and utility charges attributable to the Frito–Lay TBT Assets; (ii) maintain adequate and appropriate insurance coverage on the Frito–Lay TBT Assets, and assume all costs and expenses in connection therewith, (iii) make all repairs or equipment replacements, and bear the expense of all repairs, maintenance, operation and replacement relating to the Frito–Lay TBT Assets; (iv) assume all risk of loss associated with the Frito–Lay TBT Assets, including, without limitation, the occurrence of a casualty to the property or any other injury, whether to person or property, result-ing from or attributable to LTV Steel's use or possession of the Frito–Lay TBT Assets, and (v) indemnify Frito–Lay for liability of loss incurred by Frito–Lay upon a failure of the TBT Agreement to confer expected tax benefits or detriments upon Frito–Lay. (*See*, Affidavit of Marvin A. Kunde. Esq.) Thus, it is clear from the TBT Agreements themselves that Frito–Lay neither assumes nor is burdened by any of the traditional obligations or indicia associated with ownership or lessor status. *See*, *In re Nite Lite Inns*, 13 B.R. at 908.

Therefore, based upon the aforementioned analysis, this Court finds that the Frito–Lay TBT Agreements, as is true with TBT Agreements in general, both in pure economic substance and intent, are not true "leases" for state law or federal bankruptcy law purposes. It therefore follows, that by definition, the Frito–Lay TBT Agreements are not "unexpired leases" which are capable of being assumed or rejected under § 365 of the Code. *See*, *e.g.*, *In re PCH Associates*, 804 F.2d at 200.

## B. THE FRITO–LAY TBT AGREEMENTS DO NOT CONSTITUTE EXECUTORY CONTRACTS FOR PURPOSES OF § 365 OF THE BANKRUPTCY CODE.

While the Code does not expressly define the term "executory contract," the legislative history states that it "generally includes contracts on which performance remains due to some extent on both sides." H.R.Rep. No. 595, 95th Cong., 1st Sess. 347 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 58, *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 5844, 6303. *See*, *In re O.P.M. Leasing Servs., Inc.* ("*O.P.M. I*"), 23 B.R. 104, 117 (Bankr.S.D.N.Y.1982) (citing *Jenson v. Continental Fin. Corp.*, 591 F.2d 477, 481 (8th Cir.1979); *In re Knutson*, 563 F.2d 916, 917 (8th Cir.1977); *In re American Magnesium Co.*, 488 F.2d 147, 152 (5th Cir.1974), *reh'g denied*, 491 F.2d 1272 (5th Cir.1974)).

In the absence of a precise statutory definition of an executory contract, courts have embraced Professor Countryman's

convenient (but not universally exploitable[11]) definition of an executory contract which is as follows:

> A contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete the performance would constitute a material breach excusing the performance of the other.

Countryman, *Executory Contracts in Bankruptcy: Part I,* 57 Minn.L.Rev. 439, 460 (1973). *See, e.g., In re Stein & Day, Inc.,* 81 B.R. 263, 266 (Bankr.S.D.N.Y. 1988); *In re Texaco, Inc.,* 73 B.R. 960, 964 (Bankr.S.D.N.Y.1987); *In re Friarton Estates Corp.,* 65 B.R. 586, 593 (Bankr.S.D.N.Y.1986); *In re Chipwich, Inc.,* 54 B.R. 427, 430 (Bankr.S.D.N.Y.1985); *In re J.M. Fields Inc.,* 22 B.R. 861, 864 (Bankr.S.D.N.Y.1982); *In re Barney Schogel, Inc.,* 12 B.R. 697, 721 (Bankr.S.D.N.Y.1981). Thus, the Countryman definition of executory contract excludes from the purview of § 365 of the Code those contracts where one party has completed performance, (*see, J.M. Fields,* 22 B.R. at 864), or where the only performance that remains is the payment of money. *See,* H.R.Rep. No. 595, 95th Cong., 1st Sess. 347 (1977); *In re Newcomb,* 744 F.2d 621 (8th Cir.1984); *In re THC Fin. Corp.,* 686 F.2d 799, 804 (9th Cir.1982) (indemnity agreement is not executory because the only obligation due is the payment of money); *In re Grayson–Robinson Stores, Inc.,* 321 F.2d 500, 502 (2d Cir.1963) (guaranty agreement was not executory because "[t]he contract between them was executed except for the guarantor's obligation to pay upon default of the lessee."); *In re Unishops, Inc.,* 422 F.Supp. 75 (S.D.N.Y.1975), *aff'd,* 543 F.2d 1017 (2d Cir.1976) (agreement to guarantee debts of another is not executory).

The Countryman definition clearly requires that material future performance obligations remain on both sides of a contract in order for the contract to be executory under § 365 of the Code. *In re Stein & Day, Inc.,* 81 B.R. at 266. In the instant case, Debtors argue that neither party to the Frito–Lay Agreements has any material continuing obligations. Rather, Debtors maintain that any continuing obligations, other than the payment of money to satisfy the Benefit Loss Indemnity Claims, are either illusory, of independent origin, *de minimis,* remote or contingent. Therefore, Debtors conclude that these remaining obligations are insufficient to make these TBT Agreements executory contracts for purposes of § 365 of the Code.

In contrast, Frito–Lay asserts that the TBT Agreements are executory contracts. In support of this assertion, Frito–Lay lists the following cases in which courts have applied the Countryman's definition in finding numerous types of agreements to be executory for purposes of § 365 of the Code. *See, e.g., Lubrizol Enters., Inc. v. Richmond Metal Finishers, Inc.* ("*Lubrizol*"), 756 F.2d 1043 (4th Cir.1985), *cert. denied sub nom. Lubrizol Enterprises Inc. v. Canfield,* 475 U.S. 1057, 106 S.Ct. 1285, 89 L.Ed.2d 592 (1986) (licensing agreement); *In re Knutson,* 563 F.2d 916 (8th Cir.1977) (ticket contract); *In re Texaco, Inc.,* 73 B.R. 960 (Bankr.S.D.N.Y.1987) (indenture); *In re Gamma Fishing Co.,* 70 B.R. 949 (Bankr.S.D.Ca.1987) (insurance contract); *In re Pester Refining Co.,* 58 B.R. 189 (Bankr.S.D.Iowa 1985) (insurance contract); *In re Preston,* 53 B.R. 589 (Bankr.M.D.Tenn.1985) (sales agreement); *In re Anglo Energy Ltd.,* 41 B.R. 337 (Bankr.S.D.N.Y.1984) (employment contract); *In re Petur U.S.A. Instrument Co.,*

---

**11.** Some Courts have adopted the "functional definition" of executory contracts. This approach is based upon the underlying purpose of the assumption/rejection power, *i.e.,* the enhancement of the debtor's estate. *See, In re Jolly,* 574 F.2d 349, 351 (6th Cir.1978), *cert. denied sub nom; Still v. Chattanooga Memorial Park,* 439 U.S. 929, 99 S.Ct. 316, 58 L.Ed.2d 322 (1978). Under this approach, a contract is not executory if the bargained for benefits were received by the debtor pre-petition, or if the assumption would saddle the estate with potentially onerous obligations, while rejection would confer benefits. *In re Fox,* 83 B.R. 290, 299 (Bankr.E.D.Pa.1988); *In re W. & L. Assocs. Inc.,* 71 B.R. 962, 965 (Bankr.E.D.Pa.1987). Although this Court will not analyze the case *sub judice* using the "functional definition", it is evident that a similar result would have been achieved.

35 B.R. 561 (Bankr.W.D.Wash.1983) (license agreement); *In re Sombrero Reef Club, Inc.*, 18 B.R. 612 (Bankr.S.D.Fla. 1982) (time-share contract).

This Court, however, is not persuaded by Frito–Lay's argument that the aforementioned cases are analogous to the TBT Agreements in question. An examination of the Frito–Lay TBT Agreements demonstrates that TBT Agreements are unique in character and thus can be distinguished from the agreements considered executory in the above-mentioned decisions.

In support of its assertion that the TBT Agreements constitute executory contracts, Frito–Lay lists what it contends are continuing executory obligations to be performed by the parties as follows:

(a) LTV must pay all taxes, assessments and utility charges on the Safe Harbor Property;

(b) LTV must maintain adequate and appropriate insurance coverage and assume all costs and expenses in connection therewith;

(c) LTV must make all repairs or equipment replacements, and bear the expense of all repairs, maintenance, operating and replacement relating to the Safe Harbor Property;

(d) LTV must assume all risk of loss associated with the Frito–Lay TBT Assets;

(e) LTV must indemnify Frito–Lay against losses by reason of disqualifying events, any personal injury actions brought against Frito–Lay with reference to the Safe Harbor Property, unpaid state and local taxes, and casualty loss;

(f) LTV must not utilize the Safe Harbor Property outside of the United States;

(g) LTV must make lease payments to Frito–Lay in connection with the use of the Safe Harbor Property;

(h) LTV must realize for tax purposes as income the interest it receives on the Term Note and deduct the lease payments it makes as a business expense;

(i) Frito–Lay is required to make payments upon the Term Note;

(j) Frito–Lay is required not to interfere with LTV's right to use of the property; and

(k) Frito–Lay is required to realize for tax purposes the lease payments as income and deduct the interest paid upon the Term Note.

In addition, Frito–Lay alleges that, at the time of the Filing Date, LTV was required during the recapture period to maintain the Safe Harbor Property as § 38 Property (*i.e.*, property qualifying for the investment credit). Thus, Frito–Lay argues "[a]ll of these obligations are substantial and material in that the failure to comply with such obligations could result in the loss of tax benefits to Frito–Lay." (*See*, Frito–Lay's Application In Support Of Cross–Motion at para. 54.)

Upon examining the various terms of the Frito–Lay TBT Agreements, this Court agrees with Debtors' statement that the remaining obligations as outlined above are *de minimis*, remote, and/or insufficient to render the TBT Agreements executory in nature.

First, Debtors are correct in their assertion that, "[a]s in the case with all Safe Harbor Leases, the Debtor–Lessee's obligation to make quarterly rental payments to Frito–Lay is wholly illusory; these obligations are absolutely contingent upon and directly offset against Frito–Lay's corresponding nonrecourse installment loan repayment obligation". *See*, Debtor's Memorandum of Law at 30. Thus, the TBT Agreements are structured so that these reciprocal obligations effectuate a wash. Furthermore, § 7.01 of the Frito–Lay Agreement, itself, demonstrates the illusory nature of the lease rental and installment loan repayment obligations. Section 7.01 provides in pertinent part as follows:

7.01 Limited Nature of Lessor's Interest in the Equipment. *Lessor shall have no right, title or interest in any item of Equipment as a result of entering into this Agreement, and no such right, title or interest shall arise at any time hereafter,* except for the sole and exclusive right to claim such Federal income tax deductions and credits with respect to

each Item of Equipment that are allowable to Lessor by reason of the treatment of this Agreement as a lease of each item of property.... In particular, and without limiting the generality of the foregoing, *this Agreement shall not (a) effect a transfer of legal or equitable title to any Item of Equipment from Lessee to Lessor, (b) grant to Lessor any possessory right whatsoever in any Item of Equipment, or (c) grant to Lessor the right to claim any possessory right with respect to any Item of Equipment* upon the occurrence or nonoccurrence of any event or under any circumstances of any breach by Lessee of any of its obligations hereunder. Subject only to Lessor's right to claim Federal income tax deductions and credits with respect to each Item of Equipment as contemplate by this Agreement, *Lessee shall retain all of the rights, benefits, incidents, burdens and obligations of ownership of each Item of Equipment, including without limitation, the right to sell, transfer, assign or otherwise dispose of any Item of Equipment and the obligation to pay all state and local taxes, all insurance premiums and all maintenance charges with respect to each Item of Equipment....* (emphasis added.)

■ Even if this Court held that the parties' off-setting monetary obligations did in fact constitute a material remaining performance obligation, it is clear that such obligations merely represent obligations for the payment of money only and are therefore insufficient to make these TBT Agreements executory. *See,* H.R.Rep. No. 595, 95th Cong., 1st Sess. 347 (1977); *In re Newcomb,* 744 F.2d at 624; *In re Grayson–Robinson Stores, Inc.,* 321 F.2d at 502; *In re THC Financial Corp.,* 686 F.2d at 804; *In re Unishops, Inc.,* 422 F.Supp. at 78–80.

Moreover, the TBT Agreement's requirement that LTV Steel maintain adequate and appropriate insurance coverage is *de minimis* in the overall context of the underlying transaction. It is clear that LTV Steel's obligation to insure its property

arises from many sources, both legal and contractual, and would normally be required to do so independently of these TBT Agreements as incidental to LTV Steel's retained ownership. *In re Stein & Day, Inc.,* 81 B.R. at 266. This obligation is merely a further demonstration that the Debtors are the true owners of the TBT Assets and that this transaction was solely for the sale of certain tax attributes of ownership of property. (*See,* Toy, 58 Am. Bankr.L.J. at 253.)

Additionally, the requirement that any sale of a Frito–Lay Asset be consummated subject to the Frito–Lay TBT Agreements is inconsequential and/or sufficiently remote in the overall context of the underlying transaction. Thus, the breach of the sale obligation (which is absent in some agreements and represents generally the only significant covenant in the others) simply gives rise to an indemnity payment. In fact, as demonstrated in § 7.01, *supra,* the Frito–Lay Agreements do not contain any negative or restrictive covenants limiting Debtors' use or disposition of any Frito–Lay Asset.

Furthermore, Frito–Lay's continuing obligation to reconvey upon LTV Steel's exercise of its repurchase option is merely a fiction of a Safe Harbor transaction. As stated previously, this obligation is completely illusory given the language of § 7.01, *supra,* of the TBT Agreements, which language is repeated in pertinent part as follows to emphasis its importance in determining the character of the entire TBT transaction:

Lessor shall have no right, title or interest in any item of Equipment as a result of entering into this Agreement, and no such right, title or interest shall arise at any time hereafter....

Additionally, Frito–Lay's other remaining obligations to (i) file a Notice of Federal Income Tax Ownership, (ii) contest claims which might give rise to Indemnity Loss Claims and (iii) provide LTV Steel with notice of any event which might give rise to an indemnification, are also immaterial, *de minimis,* remote and contingent obligations which are not sufficient to make

these TBT Agreements executory contracts for purposes of § 365 of the Code. These obligations are merely designed to implement the various indemnification obligations of the Debtors and thus cannot be considered as independent obligations of Frito–Lay which are material in nature. Indeed, an assertion on the part of Frito–Lay that a breach of any of the aforementioned obligations would constitute a material breach excusing the performance of the Debtors would be disingenuous at best. In fact, a failure by Frito–Lay to fulfill any of these obligations would not effect any of the Debtors economic and possessory rights in the property. A failure here by Frito–Lay is not preclusive of Debtors' rights of ownership, dominion and control.

Finally, Debtors argue that LTV Steel's TBT-related contingent indemnity obligations constitute nothing more than contingent repayment obligations and thus, such contingent obligations are insufficient to make these TBT Agreements executory contracts for purposes of § 365 of the Code. *In re THC Fin. Corp.*, 686 F.2d at 804; *see, In re Grayson–Robinson Stores Inc.*, 321 F.2d at 501; *see also*, H.R.Rep. No. 595, 95th Cong., 1st Sess. 347 (1977), U.S.Code Cong. & Admin.News 1978, pp. 6303–04 ("A note is not usually an executory contract if the only performance that remains is repayment. Performance on one side of the contract would have been completed and the contract is no longer executory.")

In contrast, Frito–Lay relies on the case of *In re O.P.M. Leasing Servs., Inc.* ("*O.P.M. I*") 23 B.R. 104 (Bankr.S.D.N.Y. 1982) in which this Court held that a certain master equipment lease was "clearly executory" since it contained "many substantial obligations to be performed" including the obligation to defend and indemnify. *Id.* at 117. However, Frito–Lay's reliance is misplaced. First, it cannot be disputed that the executory contract in question in *O.P.M. I* was a "true lease" for purposes of § 365 of the Code. Additionally, in *O.P.M. I,* the obligation to defend and indemnify was merely one of many remaining obligations which most importantly included obligations by the lessor (i) to reim-

burse lessee for monthly maintenance charges, and (ii) to pay the lessee for all transportation charges in connection with the eventual return of the equipment; and obligations by the lessee (i) to maintain the equipment in good operating order, and (ii) to the return the equipment at the end of the lease term. *Id.* Thus, in *O.P.M. I*, the "*many* substantial obligations to be performed" taken in their entirety made that agreement executory. Here, an obligation by Debtors to defend and indemnify alone without any other material remaining obligations is insufficient to characterize these TBT Agreements as executory. *See, In re THC Fin. Corp.*, 686 F.2d at 804.

Consequently, the instant case can be distinguished from the case of *In re Preston*, 53 B.R. 589 (Bankr.M.D.Tenn.1985) which held that a debtor's car dealership was an executory contract because the Debtor had a duty to indemnify *and* the indemnitee had a continuing obligation to provide vehicles. *Id.* at 592. The *Preston* Court stated that "[t]o be executory, it is necessary that performance remain for both parties." *Id.* In this case, it is clear that any continuing obligation on the part of Frito–Lay is remote, contingent or *de minimis* and are thus insufficient to render these TBT Agreements executory.

This Court does not dispute the fact that the "contingency of an obligation does not prevent its being executory under § 365." *Lubrizol*, 756 F.2d at 1046; *see also, In re Chipwich, Inc.*, 54 B.R. 427 (Bankr.S.D.N.Y.1985). However, as stated previously, it is undisputed that "where one party to a contract has no post-petition obligation (*or no such obligation other than payment of money* ), the contract will not be found to be executory." *See*, Frito–Lay's Memorandum at 8, (citing *In re Grayson–Robinson Stores, Inc.*, 321 F.2d at 502; *In re KMMCO, Inc.*, 40 B.R. 976 (Bankr.E.D. Mich.1984); *In re Structurlite Plastics Corp.*, 86 B.R. 922 (Bankr.S.D.Ohio 1988); *In re Clark Resources, Inc.*, 68 B.R. 358 (Bankr.N.D.Okla.1986); *In re Cooper*, 47 B.R. 842 (Bankr.W.D.Mo.1985)) (emphasis added). Thus, in this regard, both the *Lubrizol* and *Chipwich* cases can be distin-

guished from the case *sub judice*. In *Lubrizol* and *Chipwich*, the agreements in question involved on-going relationships between the debtors and the licensees pursuant to license agreements in which the debtors were required to continually indemnify the licensees for the use of either technology or trademarks respectively. In contrast, the Frito–Lay TBT Agreements were for the one-time sale of tax benefits, and therefore there is no continual use of property, either tangible or intangible, which would make the instant TBT Agreements analogous to the license agreements. Accordingly, it is clear that the remaining indemnification obligations in the Frito–Lay Agreements are immaterial, *de minimis* and remote in the context of the overall Frito–Lay TBT Agreements. Even if these obligations did come to fruition, they merely require the payment of money, and are thus not executory in nature.

Furthermore, Frito–Lay's argument that both LTV and Frito–Lay have actually performed numerous obligations under the TBT Agreements during the post-petition period is also unpersuasive. For example, Frito–Lay asserts as follows:

> [T]hat LTV continued after the Filing Date, to send Frito–Lay annual notices of changes in the status of Safe Harbor Property; it notified Frito–Lay of certain dispositions of Safe Harbor Property such as the permanent retirement of Safe Harbor Property at Buffalo and Aliquippa, it transferred some Safe Harbor Property such as property at Warren and certain mill motors at Aliquippa subject to the Safe Harbor Property, and LTV, Frito–Lay and the transferees of such Safe Harbor Property all made certain notifications and filings to evidence the transfers in accordance with the provisions of the Temporary Treasury Regulations. Additionally, LTV accounted for Safe Harbor Lease rental payment deductions and Term Note Payment income in its tax returns. (citations omitted).

*See*, Frito–Lay's Memorandum Of Law at 21–22. This Court finds that those [essentially notice serving] obligations are either *de minimis*, benign, or run to the aforementioned indemnity obligations and thus,

do not alter the nature of these TBT Agreements as having been fully executed.

Frito–Lay's final argument is based on its assertion that the TBT Agreements conferred a very substantial continuing benefit upon LTV. In that regard, Frito–Lay asserts in pertinent part as follows:

> First ... the TBT transactions resulted in the receipt by LTV of $189,000,000 *in cash*. Additionally, LTV continued to enjoy the post-petition right to and did in fact deduct its lease payments from its taxable income. Former IRC Section 168(f)(8), as a safe harbor, requires rigid compliance with its provisions to continue to enjoy the benefits conferred. A deviation from the terms of the contract or tax law is necessarily material if it results in loss of Frito–Lay's bargained for benefit.

(*See*, Opposition And Affidavits of Frito–Lay at para. 14.) (emphasis in original). Additionally, Frito–Lay argues that "whatever LTV's interpretation of the literal language of the documents, evidence of the *post-petition* actions of the parties carrying out the provisions of such agreement will demonstrate the executory nature of the TBT Agreements." (*See*, *id.* at para. 15.) (emphasis in original). Frito–Lay also argues that "to the extent LTV obtained a post-petition benefit under the TBT Agreements, which it has by allegedly retiring and abandoning the Safe Harbor Property, it must take the detriment, namely the obligation to pay Frito–Lay for its repurchase of the Safe Harbor Property." (*See*, Frito–Lay's Application In Support Of Cross–Motion at para. 56.)

As stated previously, this opinion is limited to those issues outlined in the Debtor's Motion For Partial Summary Judgment which are based directly on contractual rights of the parties pursuant to the TBT Agreements, to wit: Whether the Frito–Lay TBT Agreements are executory contracts or unexpired leases under § 365 of the Code, and whether the Indemnity Loss claims being asserted by Frito–Lay are pre-petition general unsecured claims which are not entitled to priority. Frito–Lay's yet to be filed Cross–Motion seeking adminis-

trative expense entitlement, which is not presently before the Court, allegedly will involve issues relating to Debtors' post-petition conduct which are found in tort, conversion, misrepresentation, etc.... Consequently, Frito–Lay's assertion that these alleged activities render these TBT Agreements executory is misguided. Rather, "[a]t this juncture, the only issue before [this Court] is whether LTV's *contractual* obligation to indemnify accords Frito–Lay an administrative or general unsecured claim." *In re Chateaugay Corp.*, 99 B.R. 206, 208 (S.D.N.Y.1989) (emphasis in original). Therefore, Frito–Lay's additional grounds for recovery, if any, are matters for another day and do not preclude a determination at this time that the Frito–Lay TBT Agreements are not executory. (*See*, TR. at 6–10, 65–7.)

In conclusion, the Frito–Lay TBT Agreements, as is true with TBT Agreements in general, are agreements for a limited purpose, *i.e.* the temporary transfer of the right to utilize the federal income tax attributes of certain assets. Thus, this Court holds that the Frito–Lay TBT Agreements have been fully performed, have achieved their structured purposes, and that any obligations which still may exist pursuant to these TBT Agreements are, indeed, extremely passive in nature. Therefore, these TBT Agreements do not constitute either true leases or executory contracts for purposes of § 365 of the Code and, thus, are not susceptible to assumption or rejection.

ISSUE II. *The Indemnity Loss Claims Being Asserted By Frito–Lay Are Pre-petition General Unsecured Claims Which Are Not Entitled To Priority.*

Pursuant to § 1141(d)(1)(A) of the Code and as a major departure from the since repealed Bankruptcy Act, the confirmation of a debtor's plan of reorganization discharges the debtor "from any debt that arose before the date of ... confirmation...." Section 101(11) of the Code defines "debt" as a "liability on a claim." Moreover, § 1141(c) of the Code provides that, upon confirmation, "the property dealt with by the plan is free and clear of all claims and interests of creditors...."

As stated by this Court in *In re Johns–Manville Corp. ("Manville I")*, 57 B.R. 680 (Bankr.S.D.N.Y.1986), "[a] 'claim' is broadly defined by § 101(4)(A) as 'a right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured.'" *Id.* at 686. The legislative history to § 101(4) demonstrates that the term "claim" is intended by this definition to be as broadly interpreted as possible so that maximum relief can be afforded to a debtor:

> The effect of the definition [of claim] is a significant departure from present law [*i.e.*, the Act].... The definition.... adopts an even broader definition of claims than is found in the present debtor rehabilitation chapters [*i.e.*, Chapters X, XI, and XII]. The definition is any right to payment, whether or not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured. The definition also includes as a claim an equitable right to performance that does not give rise to a right to payment. By this broadest possible definition ... [the Bankruptcy Code] contemplates that all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy case. It permits the broadest possible relief in the bankruptcy court.

H.R.Rep. No. 595, 95th Cong., 1st Sess. 309, *reprinted in* 1977 U.S.Code Cong. & Admin.News 5963, 6266; *see also*, S.Rep. No. 989, 95th Cong., 2d Sess. 21–22, *reprinted in* 1978 U.S.Code Cong. & Admin. News 5787, 5807–08.

The Court of Appeals for the Second Circuit, in *In re Robinson*, 776 F.2d 30 (2d Cir.1985), *rev'd on other grounds*, 479 U.S. 36, 107 S.Ct. 353, 93 L.Ed.2d 216 (1986) "citing a compendium of case-law, characterized the scope of the term claim as being:"

*inter alia,* 'broad,' *Ohio v. Kovacs* [469 U.S. 274] 105 S.Ct. 705, 709 [83 L.Ed.2d 649] (1985); 'very broad,' *In re M. Frenville Co., Inc.,* 744 F.2d 332, 336 (3d Cir.1984) *cert. denied* [469 U.S. 1160] 105 S.Ct. 911 [83 L.Ed.2d 925] (1985); 'extremely broad [ ],' *In re Kennise Diversified Corp.,* 34 Bankr. 237, 244 n. 6 (Bankr.S.D.N.Y.1983); 'could not be broader,' *In re Thomas,* 12 Bankr. 432, 433 (Bankr.S.D.Iowa 1981); 'broadest possible' *Kallen v. Litas,* 47 Bankr. 977, 982 (N.D.Ill.1985); *In re Vasu Fabrics, Inc.,* 39 Bankr. 513, 517 (Bankr.S.D.N.Y. 1984); *In re Johns–Manville Corp.,* 36 Bankr. 743, 754 n. 6 (Bankr.S.D.N.Y.1984 [*aff'd,* 52 Bankr. 940 (S.D.N.Y.1985)]; 'all-encompassing,' *In re Baldwin–United Corp.,* 48 Bankr. 901, 903 (Bankr.S.D. Ohio 1985); *In re Barnett,* 42 Bankr. 254, 257 (Bankr.S.D.N.Y.1984); and 'sufficiently broad to cover any possible obligation,' *In re Smith Jones, Inc.,* 26 Bankr. 289, 293 (Bankr.D.Minn.1982).

*Manville I,* 57 B.R. at 687. The Second Circuit concluded that Congress intended "that virtually all obligations to pay money [would] be amenable to treatment in bankruptcy proceedings." *Robinson,* 776 F.2d at 34.

The Code's definition of a "claim" rejected the "provability" concept under the Act which was found to be both unworkable and inequitable.

> [The Bankruptcy Code] abolishes the concept of provability in bankruptcy case. All claims against the debtor whether or not contingent or unliquidated, will be dealt with in the bankruptcy case.... The proposed law will permit a complete settlement of the affairs of a bankruptcy debtor, and a complete discharge and fresh start.

H.R.Rep. No. 595, 95th Cong., 1st Sess. 180 (1977), 1978 U.S.Code Cong. & Admin. News 6141, *see also, In re Remington Rand Corp.,* 836 F.2d 825, 829 (3rd Cir. 1988).

In these very same Chapter 11 cases, the District Court was confronted with, *inter alia,* the issue of whether the purported restoration of certain of the Debtors' pension plans by the Pension Benefit Guaranty Corporation ("PBGC") was legally effective and whether the PBGC had pre-petition or post-petition claims. *In re Chateaugay Corp.,* 87 B.R. 779 (S.D.N.Y.1988); *aff'd sub nom. Pension Ben. Guaranty Corp. v. LTV.,* 875 F.2d 1008 (2d Cir.1989). The District Court found as follows:

> [c]onsistent with the goals of uniform treatment for creditors and a fresh start for debtors, courts have determined when a claim arises for Code purposes by focusing upon 'the time when the acts giving rise to the alleged liability were performed,' since only reference to pre-petition acts of the debtor will result in treating liabilities flowing from such acts in an equitable fashion.

*Id.* at 796 (citing *Manville I,* 57 B.R. at 690); *accord Grady v. A.H. Robins Co., Inc.,* 839 F.2d 198, 202 (4th Cir.1988), *cert. dismissed sub nom, Joynes v. A.H. Robins Co., Inc.,* —— U.S. ——, 109 S.Ct. 201, 101 L.Ed.2d· 972 (1988); *In re Edge,* 60 B.R. 690, 699 (Bankr.M.D.Tenn.1986). The District Court also held that when a claim arises is determined by bankruptcy law in the absence of an overriding non-bankruptcy federal policy or interest. *In re Chateaugay Corp.,* 87 B.R. at 796. Moreover, and critical to this Court's determination of the pending matter is the District Court's holding that "[w]here the debtors' obligations stem from contractual liability, even a post-petition breach will be treated as giving rise to a prepetition liability where the contract was executed prepetition." *Id.*

A case which is directly on point on this issue is *In re THC Fin. Corp.,* 686 F.2d 799 (9th Cir.1982), in which a creditor sought to assert its indemnification claim as a priority expense of administration. The agreement in question was executed prior to the debtor's bankruptcy filing. However, the Bankruptcy Court determined that even though the creditor's indemnification claim matured post-petition, the claim nevertheless existed as a contingent claim as of the date the underlying indemnity agreement was executed. On appeal, the creditor argued that its claim under the indemnification agreement did not materialize until after the debtor's bankruptcy proceeding

commenced and as a result, its claim should be afforded priority administrative expense status. The Ninth Circuit disagreed and held that the creditor's claim arose at the time the parties' entered into the indemnification agreement. *Id.* at 802. In support of its holding the Court stated as follows:

> We have little guidance in determining whether ... [the] indemnification claim existed as a contingent claim in 1976 or did not arise until some later date. But the cases which have been decided, together with the structure and purpose of the Bankruptcy Act [and Bankruptcy Code], suggest that any doubts should be resolved in favor of finding a contingent claim existed [as of the date of execution].

*Id.*

*In re Remington Rand Corp.*, 836 F.2d 825 (3rd Cir.1988), the Third Circuit held that in bankruptcy the existence of a valid claim and, in turn, the obligation to assert such a claim prior to the bar date, depends on "(1) whether the claimant possessed a right to payment; and (2) when that right arose." *Id.* at 830. (citing *In re M. Frenville Co., Inc.*, 744 F.2d 332, 336 (3rd Cir. 1984), *cert. denied*, 469 U.S. 1160, 105 S.Ct. 911, 83 L.Ed.2d 925 (1985).[12] Applying these principles to an ordinary contract indemnity scenario, the Third Circuit stated in *dicta* that "an indemnity or surety agreement creates a right to payment, albeit contingent, between the contracting parties immediately upon the signing of the agreement." *In re Remington Rand*, 836 F.2d at 830.

Based upon the aforementioned case-law, this Court holds that the Frito–Lay Indemnity Loss claims pursuant to the Frito–Lay TBT Agreements which were entered into and executed prior to the filing date are clearly pre-petition claims. The fact that the Indemnity Loss claims remain contingent until the occurrence of a triggering or disqualifying event or termination of such agreements is not controlling. Once the contingency occurs, even if it occurs post-petition, "the contingent claim simply becomes a liquidated one; it, however, is not thereby elevated to the status of a post-petition claim." *In re Chateaugay Corp.*, 87 B.R. at 797; *see also, In re Amfesco Indus., Inc.*, 81 B.R. 777 (Bankr.E.D.N.Y. 1988) (indemnity claims triggered post-petition are still pre-petition claims and are not entitled to administrative expense priority).

Further, the Frito–Lay Indemnity Loss claims which arise as a result of post-confirmation triggering or disqualifying events, although presently contingent, cannot escape unaffected by the Debtors' reorganization, and are thus subject to a confirmed plan of reorganization in these Chapter 11 cases. Therefore, post-confirmation triggering or disqualifying events shall give rise to "claims" which are cognizable in these reorganization proceedings. *In re Remington Rand*, 836 F.2d at 831–32; *In re Radio–Keith–Orpheum Corp.*, 106 F.2d 22, 27 (2d Cir.1939); *cert. denied*, 308 U.S. 622, 60 S.Ct. 380, 84 L.Ed. 520 (1940).

Moreover, the same result is obtained when the issue is approached pursuant to § 503(b) of the Code, which governs the granting of an administrative priority. Section § 503(b) provides in pertinent part as follows:

> After notice and a hearing, there shall be allowed administrative expenses ... including—
>
> (1)(A) the actual, necessary costs and expenses of preserving the estate, includ-

---

**12.** In *Remington Rand,* the Third Circuit distinguished its earlier opinion by stating that although "[in] *Frenville,* ... we held that a third-party's indemnity or contribution claim did not arise before the bankruptcy petition, because, under state law, third-parties do not possess any rights until the contracting parties first establish a primary obligation to pay, ... we acknowledged that in some cases, overriding federal policy would require us to consult federal law. *Remington Rand,* 836 F.2d at 830 (citing *Frenville,* 744 F.2d at 337). It should be noted that the *Frenville* decision has been subject to substantial criticism. *See, e.g., In re Johns–Manville Corp.,* 57 B.R. 680 (Bankr.S.D.N.Y.1986); *In re A.H. Robins Co., Inc.,* 63 B.R. 986, 990 n. 13 (Bankr.E.D.Va.1986); *In re Edge,* 60 B.R. 690, 699 (Bankr.M.D.Tenn.1986). *In re Baldwin–United Corp.,* 48 B.R. 901, 903 (Bankr.S.D.Ohio 1985); *In re Yanks,* 49 B.R. 56, 58 (Bankr.S.D. Fla.1985).

ing wages, salaries, or commissions for services rendered after the commencement of the case....[13]

However, a Court is not limited to the specific examples of claims explicitly set for in § 503(b) as giving rise to an administrative expense. As stated in 3 *Collier On Bankruptcy* ¶ 503–03 at 503–17 (15 ed. 1989):

> While it is true that the court is not free to fashion additional priorities it ought not be assumed that the six designations are necessarily exclusive of or designed to cover every conceivable situation. The use of the word "including": as the last word in the lead-in sentence of section 503(b), in accordance with section 102(3), is not limiting. Section 102(3) states that the words "includes" and "including" are not limiting. A court might well conclude that there are to be allowed as administrative expenses claims not necessarily precisely covered by the provisions of section 503(b).... Further, what constitute actual and necessary costs and expenses of preserving an estate might well be open to judicial construction.

The significance of determining whether Frito–Lay's Claims constitute an administrative expense is that such claims would therefore be entitled to first priority status in a distribution pursuant to a plan(s) of reorganization under § 507(a)(1) of the Code.

■ It is well-established in this Circuit that priorities are to be narrowly construed, and that " '[i]f one claimant is to be preferred over others, the purpose should be clear from the statute.' " *Amalgamated Ins. Fund v. McFarlin's Inc.*, 789 F.2d 98, 101 (2d Cir.1986) (quoting *Nathanson v.*

*N.L.R.B.*, 344 U.S. 25, 29, 73 S.Ct. 80, 83, 97 L.Ed. 23 (1952)). *In re Amfesco Indus., Inc.*, 81 B.R. at 785–86. *See, e.g., In re United Merchants & Mfrs., Inc.*, 597 F.2d 348, 349 (2d Cir.1979); *In re Jartran, Inc.*, 732 F.2d 584, 586 (7th Cir.1984); *In re Mammoth Mart, Inc.*, 536 F.2d 950, 953 (1st Cir.1976). A bankruptcy court is without discretion or authority to deviate from the Bankruptcy Code's narrow list of priorities on purely equitable grounds. *In re Lockwood Enters., Inc.*, 54 B.R. 829, 832 (Bankr.S.D.N.Y.1985); *see, generally, In re Amfesco Industries, Inc.*, 81 B.R. at 785; *In re Baldwin–United Corp.*, 43 B.R. 443, 456–57 (Bankr.S.D.Ohio 1984). Additionally, it is clear that the burden of establishing entitlement to priority rests with the claimant. *See, In re Amfesco Indus., Inc.*, 81 B.R. at 785; *In re O.P.M. Leasing Serv., Inc.* ("*O.P.M. II*"), 60 B.R. 679, 680 (Bankr.S.D.N.Y.1986).

■ The criteria for determining whether a claim qualifies for administrative priority are set forth in *In re Mammoth Mart, Inc.*, 536 F.2d at 950, a seminal case decided under the former Bankruptcy Act but equally applicable under the Code. In *Mammoth Mart*, the Court was confronted with the issue of whether severance pay claims of the debtor's former employees who had been terminated post-petition were entitled to administrative priority. In determining that these claims were not administrative, the Court held that in order to be entitled to administrative priority, a claimant must demonstrate that the obligation in question (i) arose from a transaction with the debtor-in-possession and (ii) resulted in a direct benefit to the estate. *Id.* at 954.[14]

---

13. 11 U.S.C. § 503(b)(1)(A) (1988).

14. Frito–Lay relies on *In re Unishops, Inc.*, 553 F.2d 305, 308 (2d Cir.1977) in arguing that its claims are entitled to an administrative priority. In *Unishops*, the Second Circuit stated as follows:

> It is settled law that a claim arising under an executory contract is entitled to priority "if the trustee or debtor in possession elects to assume the contract or if he receives benefits under it."

*Id.* at 308 (quoting *American Anthracite and Bituminous Coal Corp. v. Leonardo Arrivabene, S.A.*, 280 F.2d 119, 124 (2d Cir.1960); *In re Mammoth Mart, Inc.*, 536 F.2d 950, 954 (1st Cir.1976)). However, the *Unishops'* test is not controlling in the case *sub judice*, as this Court has previously determined that there is no executory contract involved. (*See,* Discussion, Issue I, A & B, *supra*.)

The holding in *Mammoth Mart* was based on two overriding policy objectives of federal bankruptcy law. First, the Court began "with the premise that the theme of the Bankruptcy Act [and the Bankruptcy Code] is 'equality of distribution'" and that "[i]f one claimant is to be preferred over others, the purpose should be clear from the statute.'" *Id.* at 953 (citing *Nathanson v. N.L.R.B.*, 344 U.S. 25, 29, 73 S.Ct. 80, 83, 97 L.Ed. 23 (1952); *see, Sampsell v. Imperial Paper & Color Corp.*, 313 U.S. 215, 219, 61 S.Ct. 904, 907, 85 L.Ed. 1293 (1941)). The First Circuit noted that to give priority to a claimant who was not clearly entitled thereto would not only be inconsistent with the policy of equality of distribution, it would also "dilute[ ] the value of the priority for those creditors Congress intended to prefer." *Mammoth Mart, Inc.*, 536 F.2d at 953.

Second, the fundamental purpose of Chapter XI of the Bankruptcy Act (and Chapter 11 of the Code) is the "rehabilitation of the debtor's business." *Id.* The debtor-in-possession is viewed as a separate legal entity from the pre-petition debtor[15] and is empowered "to take all steps necessary to solve the problems created by the debtor's operation of the business in the past." *Id.* at 954. Finally, "Congress recognized that, if a business is to be reorganized, third parties must be willing to provide the necessary goods and services." *Id.* Therefore, in order to induce such third parties to do business with the debtor-in-possession, Congress provided in the former Bankruptcy Act (and the Code) for administrative priority (*i.e.*, payment in full) for those expenses incurred by a debtor-in-possession which serve to "maintain, preserve, or rehabilitate the ... estate." *Id.*

Thus, in light of the reorganization and equality of distribution policies underlying federal bankruptcy law, the First Circuit held that for a claim to be entitled to administrative priority, "the debt must arise from a transaction with the debtor-in-possession." *Id.* The Court in *Mammoth Mart* further stated that "[i]t is only when the debtor-in-possession's actions themselves—that is, considered apart from any obligation of the pre-petition debtor—give rise to a legal liability that the claimant is entitled to the priority of a cost and expense of administration." *Id.* at 955. Where the claim arises out of a contract between the debtor and the claimant, the "creditor's right to payment will be afforded first priority only to the extent that the consideration supporting the claimant's right to payment was both supplied to and beneficial to the debtor-in-possession in the operation of business." *Id.* at 954. Moreover, "even when there has technically been performance by the contract creditor during the reorganization period, he will not be entitled to [administrative] priority if the ... estate was not benefitted in fact therefrom." *Id.*

Since there is little difference between § 503(b)(1)(A) of the Code and § 64(a)(1) of the former Bankruptcy Act, it had been held that "the body of law that grew up interpreting § 64(a)(1) has value as precedent in interpreting 11 U.S.C. § 503(b)(1)(A)." *In re Peninsula Gunite, Inc.*, 24 B.R. 593, 594 (Bankr. 9th Cir.1982); *In re Yost*, 54 B.R. 818, 821 (Bankr.W.D. Ky.1985). Thus, numerous courts, including the Court of Appeals for the Second Circuit, have continued to follow *Mammoth Mart's* treatment of administrative expense claims in cases under the Code.[16]

**15.** "It appears to be the rule in this Circuit that a debtor-in-possession under Chapter XI is not the same entity as the pre-bankruptcy company; but is a new entity with its own rights and duties, subject to the supervision of the Bankruptcy Court" *In re CRS Architectural Metals Corp.*, 1 B.R. 729, 731 (Bankr.E.D.N.Y.1979) (citing, *Allegaert v. Perot*, 548 F.2d 432, 435–36 (2d Cir.1977), *cert. denied* 432 U.S. 910, 97 S.Ct. 2959, 53 L.Ed.2d 1084 (1977); *Truck Drivers Local U. No. 807 v. Bohack Corp.*, 541 F.2d 312, 320 (2d Cir.1976), *cert. denied* 439 U.S. 825, 99

S.Ct. 95, 58 L.Ed.2d 117 (1978); *Brotherhood of Railway, etc. v. REA Express, Inc.*, 523 F.2d 164 (2d Cir.), *cert. denied* 423 U.S. 1017, 1073, 96 S.Ct. 451, 855, 46 L.Ed.2d 388, 47 L.Ed.2d 82 (1975, 1976); *Shopmen's Loc. U. No. 455, etc. v. Kevin Steel Prod., Inc.*, 519 F.2d 698, 704 (2d Cir.1975); *In re W.T. Grant Co.*, 474 F.Supp. 788, 793 (S.D.N.Y.1979).

**16.** Although the Second Circuit cases differ from *Mammoth Mart* in holding severance pay claims arising from post-petition termination to

*See, e.g., Amalgamated Ins. Fund v. McFarlin's Inc.,* 789 F.2d at 101; *In re White Motor Corp.,* 831 F.2d 106, 110 (6th Cir.1987); *In re Jartran, Inc.,* 732 F.2d at 586–88; *see also, In re Baths Int'l, Inc.,* 25 B.R. 538, 540 (Bankr.S.D.N.Y.1982), *aff'd,* 31 B.R. 143 (S.D.N.Y.1983).

The Court in *In re Jartran, Inc.,* 732 F.2d 584 (7th Cir.1984), for example, was required to determine whether an advertising agency's claims arising from its pre-petition placement of the debtor's telephone directory ads were entitled to administrative priority under § 503 of the Code when the advertisements were published following the debtor's Chapter 11 filing. Relying upon *Mammoth Mart's* two-part administrative priority test, the Court held that the publication costs associated with the debtor's advertisements could not constitute a post-petition administrative claim notwithstanding the fact that the ads were published post-petition and benefited the debtor-in-possession. In reaching this conclusion, the Court stated:

> We recognize that the services performed by appellants after the closing date, and after the filing of the petition, were significant and of value to Jartran. However, appellants do not allege that Jartran, after the filing of the petition, requested that appellants continue work on ads for which the closing date had passed.... Thus, it was the pre-petition Jartran and not Jartran as debtor-in-possession that *induced* appellants to perform these services. To serve the policy of priority, inducement of the creditor's performance *by the debtor-in-possession* is crucial to a claim for administrative priority...."

*In re Jartran, Inc.,* 732 F.2d at 587 (emphasis in original). Thus, the Court clearly rejected the proposition that the post-petition triggering of the liability incurred by the pre-petition debtor entity could elevate a pre-petition claim to a post-petition administrative priority claim. *Id.* at 587–88;

*accord, Amalgamated Ins. Fund v. McFarlin's, Inc.,* 789 F.2d at 101 (holding that a "debt is not entitled to priority simply because the right to payment arises after the debtor in possession has begun managing the estate."); *In re Chateaugay Corp.,* 87 B.R. at 797–99.

Similarly, Frito–Lay's Indemnity Loss claims arising under the Frito–Lay TBT Agreements, are pre-petition unsecured claims against the Debtors' estates and are not entitled to administrative priority under §§ 507(a)(1) and 503(b) of the Code. As previously held, each of the Frito–Lay TBT Agreements which may give rise to an Indemnity Loss or other indemnity or casualty claim were executed prior to the filing date. Indeed, it clearly was the pre-petition LTV Steel and not LTV Steel as debtor-in-possession who induced Frito–Lay to enter into a contractual relationship with it. Thus, the actions of the Debtors as debtor-in-possession, considered apart from the obligation of LTV Steel as debtor, do not give rise to any liability under the Frito–Lay TBT Agreements. *See, In re White Motor Corp.,* 831 F.2d at 110; *In re Jartran Inc.,* 732 F.2d at 587–88; *In re Mammoth Mart, Inc.,* 536 F.2d at 954–55.

Although Frito–Lay argues that "[t]he fact that LTV received cash and a note upon the execution of the TBT Agreements during the pre-petition period obviously does not preclude the fact that LTV could have and did actually receive substantial additional post-petition benefits," (*see,* Frito–Lay's Memorandum at 29), these alleged post-petition benefits stem from the alleged post-petition conduct of the Debtors as debtor-in-possession and as stated previously are not within the purview of this narrowly defined partial summary judgment motion. Examples of this post-petition conduct are alleged to include: (i) LTV's intentional post-petition decision to cause a disqualifying event; (ii) LTV's intentional failure to obtain a court order to authorize its abandonment of the Buffalo Works; (iii) LTV's unjust enrichment by having ob-

---

be entirely administrative claims, the difference of opinion is attributable to divergent views of the manner in which severance pay is earned, not to the more fundamental question of what

constitutes an administrative claim. *See, Amalgamated Ins. Fund v. McFarlin's Inc.,* 789 F.2d at 104.

tained tax benefits which were paid for by Frito–Lay; and (iv) LTV's tortious post-petition conduct in general. (*See,* Opposition And Affidavits Of Frito–Lay at para. 22). However, it is clear that the Frito-Lay TBT Agreements, themselves, confer no benefit on the debtor-in-possession. Indeed, the benefits which were bargained for by LTV Steel were the initial cash payment it received pre-petition at the time it originally entered into these TBT Agreements. The Debtors' indemnity obligation clearly arises under contracts that were executed pre-petition and thus the Frito–Lay Claims are deemed to be of general unsecured status. *See, e.g., Amalgamated Ins. Fund. v. McFarlin's Inc.,* 789 F.2d at 101; *In re Chateaugay Corp.,* 87 B.R. at 797–98; *In re Amfesco Indus. Inc.,* 81 B.R. at 784–85. It should be noted that this Court's finding is limited to Debtors' indemnity obligations which arise under the Frito–Lay TBT Agreements. Such a finding does not preclude Frito–Lay from pursuing its allegations of tortious conduct on the part of the Debtors as debtor-in-possession, which allegations the Debtors vigorously deny, and which are the subject of another branch of this litigation.

Additionally, Frito–Lay argues that the post-petition "sale" of the TBT Assets back to LTV, by operation of law, due to LTV's post-petition conduct clearly is a transaction arising between the claimant and the debtor-in-possession, thus meeting the first prong of the *Mammoth Mart* test. However, this Court is not persuaded by Frito–Lay's argument because, as previously stated, the post-petition "sale" of the TBT Assets back to LTV by operation of law due to LTV's post-petition conduct is wholly illusory. The TBT Agreements in question, as well as TBT Agreements generally, are for the sale of tax benefits and not for the sale of the underlying assets which accompany them.[17] Thus, any "sale" or "leaseback" as contemplated in the TBT Agreement is merely an automatic conforming snap-back provision. Consequently, the post-petition "sale" or "leaseback"

of assets is a fiction, and therefore the Debtors' "actions" in this regard, as debtor-in-possession, *considered apart from any obligation of the pre-petition debtor* do not give rise to a separate or new legal liability which entitles Frito–Lay to an administrative priority. *See, Mammoth Mart,* 536 F.2d at 955.

Furthermore, as stated previously, any Frito–Lay indemnification claims which may arise post-confirmation, while presently contingent, nevertheless constitute claims under § 101(4) of the Code. Thus, the Indemnity Loss obligation which a Tax Lessor under a pre-petition TBT Agreement, such as Frito–Lay, may assert against the Tax Lessee is a pre-petition general unsecured claim, regardless of whether the triggering or disqualifying event or termination occurs pre-petition or post-petition. Therefore, such a claim may be treated under the Debtors' plan(s) of reorganization and will be discharged upon the confirmation of such a plan(s).

ISSUE III. *The Debtors Are Entitled To Partial Summary Judgment In Connection With The Objection And Consistent With Its Summary Judgment Motion.*

Rule 56 of the Federal Rules, made applicable herein pursuant to Bankruptcy Rules 7056 and 9014, provides that a party seeking declaratory relief may move for summary judgment. Fed.R.Civ.P. 56(a). Summary judgment is appropriate where the movant demonstrates that there are no genuine issues of material fact to be tried and the court may decide issues as a matter of law. Fed.R.Civ.P. 56(c); *see, e.g., Quinn v. Syracuse Model Neighborhood Corp.,* 613 F.2d 438, 444 (2d Cir.1980); *In re O.P.M. Leasing Serv., Inc.* ("*O.P.M. III*"), 46 B.R. 661, 665 (Bankr.S.D.N.Y. 1985). "On summary judgment the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d

---

**17.** The complete absence of any bona fide or recognizable interest by Frito–Lay, and Tax Lessors generally, in any particular Frito–Lay TBT Asset is illustrated by § 7.01 of the Frito–Lay Agreement. *See, supra,* at 346.

176 (1962) (per curiam); *Garza v. Marine Transp. Lines, Inc.*, 861 F.2d 23, 26 (2d Cir.1988). *Accord, e.g., Heyman v. Commerce and Industry Ins. Co.*, 524 F.2d 1317, 1320 (2d Cir.1975); *Insurance Co. of N. Am. v. M/V Atl. Corona*, 704 F.Supp. 528, 529 (S.D.N.Y.1989). However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Additionally, summary judgment has frequently been issued where a court has been requested to interpret the terms of a contract. *Tokio Marine & Fire Ins. Co. v. McDonnell Douglas Corp.*, 617 F.2d 936, 940 (2d Cir.1980); *Parish v. Howard*, 459 F.2d 616, 618 (8th Cir.1972); *Freeman v. Continental Gin Co.*, 381 F.2d 459, 465 (5th Cir.1967); *National Util. Serv., Inc. v. Whirlpool Corp.*, 325 F.2d 779, 781 (2d Cir.1963); *In re Tikijian*, 76 B.R. 304, 321 (Bankr.S.D.N.Y.1987).

Frito–Lay maintains, however, that it believes it will be able to establish at trial that it is entitled to an administrative priority status. In this regard, Frito–Lay's 13(h) Statement lists numerous issues of material fact which Frito–Lay asserts must be determined by trial and preclude the granting of summary judgment. However, a close examination of this extensive list makes it clear that only items 3(a)–(d)[18] are relevant to a determination of the instant summary judgment motion. The other "material issues of fact" go beyond the narrowly drawn issues which are before this Court today and thus do not preclude the granting of Debtors' Summary Judgment Motion. As has previously been discussed above, these four "genuine issues of material fact" submitted by Frito–Lay can be determined solely upon an examina-

tion of the TBT Agreements themselves and thus, this Court finds that the Debtors are entitled to partial summary judgment as a matter of law.

## CONCLUSION

In summary, the Debtors are entitled to judgment as a matter of law, that: (i) the Frito–Lay TBT Agreements pertaining to assets located, or previously located, at LTV Steel's Buffalo Works do not constitute executory contracts or unexpired leases which are susceptible to assumption or rejection under § 365 of the Code, and (ii) any Indemnity Loss claims of Frito–Lay associated with the Frito–Lay Agreements relating to the Buffalo Works are pre-petition general unsecured claims which are not entitled to priority treatment under §§ 503 and 507 of the Code notwithstanding when the particular Indemnity Loss is incurred.

Submit an Order consistent with the foregoing.

---

18. 3. Frito–Lay submits that the following constitute material facts as to which there exists a genuine issue to be tried:
 (a) Did LTV have material, continuing obligations post-petition under the Frito–Lay TBT Agreements?
 (b) Did LTV perform any material, continuing obligations post-petition under the Frito–Lay TBT Agreements?
 (c) Did Frito–Lay have material, continuing obligations post-petition under its TBT Agreements with LTV?
 (d) Did Frito–Lay perform any material, continuing obligations, post-petition under its TBT Agreements with LTV?